## The State *vs.* William Allen.

It is not unusual and is entirely proper for the sheriff, in anticipation of a demand for talesmen, to procure the attendance in court of persons from whom talesmen could be taken if they should be required.

He may do this of his own motion, or upon the order of the court, and where the court makes the order, it may be either written or oral.

And it makes no difference that the order was made in the absence and without the knowledge of a prisoner about to be put on trial, and without consulting his counsel.

Nor that the court at the time the order was made was holden by only one judge and the case about to be tried was a capital case requiring by law two judges.

Where a capital case has been tried, and the jury discharged because unable to agree, it is no error for the same judges to proceed to a second trial before another jury at the same term of the court

Where in a capital case the number of regular jurors had been exhausted without making up the panel, and the prisoner's counsel moved that the court order additional regularly appointed jurors to be summoned instead of appointing talesmen, it was held that the court committed no error in denying the motion.

The prisoner, while confined as a convict in the state prison, had conspired with a fellow prisoner named Hamlin to escape, and in attempting to do so in the night they had encountered an armed watchman who endeavored to stop them and was killed by a pistol-shot fired by one of them, after which they broke through into the attic of the prison, where they were taken the next morning. Both were armed with loaded pistols—one of larger calibre than the other. The bullet found in the watchman's body fitted the pistol of larger calibre, which the prisoner claimed belonged to Hamlin, and that his own pistol was not discharged. It became an important question on the trial which fired the pistol. An officer of the prison, who found the two pistols in the attic at a place where the prisoner informed him they were concealed, was called as a witness by the prisoner, and asked whether the prisoner did not state to him the condition (as to being loaded) of the pistol which he claimed to be his, before it was found by the witness. Held that, as the prisoner had had full opportunity after the homicide to learn as to the condition of both the pistols, his declaration could not be evidence in his favor.

The prisoner claimed that the fatal shot was fired by Hamlin, and that before it was fired he had abandoned the attempt to escape and gone back to his cell. The court charged the jury that if the prisoner and Hamlin, some time before the homicide, determined to try to break out of prison together, and knowing the danger of their being shot by some of the watchmen deliberately supplied themselves with deadly weapons for the purpose of killing any one who should resist them, and while they were attempting to escape they were discovered by a watchman, and in the encounter which followed he was willfully killed by either while they were acting in concert, then both were guilty of murder in the first degree; and that the prisoner would be guilty of murder in the first degree if he in fact abandoned the attempt to escape just before the fatal shot

State *v.* Allen.

was fired by Hamlin, without informing Hamlin by word or act that he had so done. Held to be no error.

The court further charged that if during the fatal encounter the prisoner suddenly abandoned Hamlin and the effort to escape, and went back to his cell without saying a word to Hamlin as to his abandonment of the attempt, and Hamlin, supposing that the prisoner was still acting with him and that he had gone to his cell for a weapon, committed the homicide in pursuance of their original purpose, the prisoner's abandonment of the attempt would be of no importance. Held to be error, as liable to mislead the jury.

If the prisoner did in fact abandon the attempt to escape before the homicide, and with the knowledge of Hamlin go back to his cell, Hamlin's misconstruction of his purpose in leaving did not necessarily make his conduct of no importance.

It was necessary that the prisoner should have informed Hamlin of his change of purpose, but such information might be by words or acts; and if with the intention of notifying him of his withdrawal from the conspiracy he did acts which should have been effectual for that purpose, but which did not produce upon Hamlin's mind the effect which he intended and which they naturally would have produced, such acts were proper for the jury to consider in determining the relation of the prisoner to the crime which was afterwards committed.

His mere leaving and going to his cell had some significance on the question of his intention and of notice to Hamlin of it, and was proper for the consideration of the jury.

The warrant under which Hamlin was committed to prison, held to be admissible to show that he was a lawful prisoner, and that the conspiracy of the two to escape was an unlawful combination.

INDICTMENT for murder, in the Superior Court for Hartford County. The prisoner was indicted with Henry Hamlin and John H. Davis for the murder of Wells Shipman, a watchman at the state prison, the murder having been committed in an attempt of the defendant and Hamlin, who were convicts, to escape from the prison. Sundry questions made with reference to proceedings in the case before the several defendants pleaded to the merits, are stated and disposed of in the next preceding case of *The State* v. *Hamlin and others.* All the defendants pleaded not guilty, and Hamlin and Davis elected (under the statute of 1874, then in force, but since repealed,) to be tried by the court without a jury. Allen was tried to the jury before *Park, C. J.,* and *Carpenter, J.*

Upon the trial the State offered evidence to prove, and claimed that it had proved, that the defendant and Hamlin, while prisoners lawfully confined in the state prison, conspired

together to escape from the prison at all hazards, even to the taking of the life of whoever might oppose them in their attempt, should the same become necessary in order to escap `; that this conspiracy and determination existed during a ʼʼ ʼʼ ber of weeks preceding the homicide, and down to the saⁱⁱⁱ; that to carry out that purpose they provided themselves with two loaded revolver pistols, one a seven-shooter, and the other a four-shooter, and with hand-cuffs and a guy; that in pursuance of their plan on Saturday, September 1st, 1877, about eight o'clock in the evening, they escaped from their cells and remained secreted on the top of the block of cells, just beneath the attic of the prison, with their pistols and other implements in their possession, until about twelve o'clock the same night, when, upon being discovered by Wells Shipman, an armed night watchman of the prison, they sprang upon him, each with a loaded pistol in his hand; that Shipman ran toward the alarm-bell, followed by Allen and Hamlin, who overtook him, when he sank down upon the corridor, and became insensible, and they hand-cuffed and gagged him; that Allen then went to his cell, leaving Hamlin with Shipman, where he was discovered when the guard, aroused by the noise, entered the prison hall; that Hamlin, upon being discovered and fired at by the guard, went to Allen's cell, and both then went on top of the block of cells, taking with them an additional implement, a piece of round iron about eighteen inches long and about one inch in diameter, and Shipman's pistol, which had been taken from him during the struggle; and that they then broke through the ceiling into the attic, and went thence into the cupola of the prison, where they remained until about five o'clock the next morning, when they surrendered and were locked in different cells. And the State claimed to have further proved that between the time when Shipman discovered Allen and Hamlin and the time when he was hand-cuffed and gagged, three pistol-shots and three only were fired by Allen, Hamlin, and Shipman, and two of them by Allen and Hamlin, and that Shipman by one of the two shots fired by the latter was shot in the heart, from the effect of which he died about ten o'clock the next

morning; that Shipman from the time he was found hand-cuffed and shot suffered intense pain, was very much pros-trated, and spake little except in answer to questions.

The State further introduced the dying declarations of Shipman, given in answer to questions, in which he stated that Hamlin shot him with his (Shipman's) pistol, while Allen stood by threatening to cut his throat at the same time.

And the State claimed to have proved further, that on the Tuesday following the murder one Arnold, a prison officer, found concealed in the attic of the prison the seven-shooter and the four-shooter, each fully loaded, and cartridges fitting the four-shooter; and that he also found in Allen's cell cart-ridges fitting both pistols.

These several claims of the State were denied by the defense.

The counsel for the defendant claimed that it was proved by evidence introduced by the State and by the defense, that whatever conspiracy there was, if any, was a conspiracy to escape from the prison by bribing Davis, an officer of the prison, to permit them to escape, and to aid them in it; that the plan contemplated an escape through a window at the west end of the prison, near the top tier of cells, before nine o'clock in the evening, the time when Shipman's duties as night watchman commenced; that there was no conspiracy or intention to take the life of Shipman or any other person, and that whatever was done after Shipman discovered Allen and Hamlin was not done in pursuance of any previous plan or conspiracy; that Shipman was not shot before he was hand-cuffed and gagged; that immediately after he was hand-cuffed Allen abandoned the enterprise and went to his cell; that Hamlin came to the cell and urged him with threatening language to come out and go on with the attempt to escape; and that Hamlin, after Allen abandoned the effort to escape, went back to the place where Shipman was lying and shot him, not in pursuance of, but apart from, any purpose or design agreed upon or contemplated by the parties.

The defendant claimed, and the fact was, that the seven-shooter was of a smaller caliber than the four-shooter, and

State *v.* Allen.

the four-shooter of smaller caliber than Shipman's pistol, and further claimed that the seven shooter belonged to Allen and had never been discharged, while the four-shooter belonged to Hamlin and had been discharged, the State at the same time claiming and the defense admitting that the pistol-ball found in Shipman's body fitted the four-shooter, and did not fit either of the other pistols.

The defense further claimed and offered evidence to prove that the three pistol-shots fired all produced about the same volume of sound, and claimed in the argument to the jury that they must have proceeded from Shipman's pistol, and that the report made by the four-shooter was much lighter, and that it must have been fired at a time considerably after the three shots mentioned in the claim of the State.

And the counsel for the defendant in their argument to the jury claimed from Shipman's dying declaration that after Shipman was left by Hamlin and Allen, Hamlin returned and shot him, from a sudden impulse, and because of the outcry of Shipman after he had been hand-cuffed and gagged.

These claims of the defense were denied by the State's Attorney, who claimed, and offered evidence to prove, that Shipman was an athletic man; that he lay upon the corridor from and after he was hand-cuffed and gagged till the prison officers came into the prison hall; that Allen's cell was up one tier of cells from the place where Shipman was lying, and was upon the opposite side of the block of cells, about one hundred and fifty feet therefrom; that the hand-cuffs and gag did not prevent Shipman from going to give an alarm or to escape from the prison hall; that the whole prison was aroused by the firing of the three pistol-shots, together with the prison officers from the outside of the prison hall; that prisoners immediately commenced to shout and call from all parts of the block of cells, and were in great excitement; that in the meantime Shipman continued to lie upon the corridor feebly calling "Deputy, Deputy;" that only three pistol-shots were fired before the prison officers entered the prison hall; and that Allen said at the time he surrendered, "This is a tough job; do you think we shall get the rope?"

The defense further claimed that there were facts and circumstances proved which tended to show that the seven-shooter was the pistol carried by Allen, and that the same had never been discharged. In this connection the defense claimed that it was a material question in the case whether Allen fired a pistol at all that night, and which of the two, Hamlin or Allen, fired the shot that killed Shipman.

The State admitted that all the evidence in the case did not show which one of the two, Hamlin or Allen, fired the shot that killed Shipman, but claimed that that question was not a material one, and that proof that Allen did not fire the fatal shot could not under the circumstances affect the question of his guilt or innocence.

To sustain the claim of the prisoner, his counsel called Arnold, the officer in the prison at the time of the homicide, who had testified that he had found the two pistols, the seven-shooter and the four-shooter, in the attic over the prison, and who now testified that he was informed where they were by Allen, and that he found them as directed. He was then asked by the prisoner's counsel: "Did Allen inform you as to the condition of the pistol before you found it?" This question was objected to by the State's Attorney and ruled out by the court, and the prisoner's counsel excepted to the ruling.

For the purpose of proving that Allen and Hamlin were lawfully confined in the state prison, the State introduced in evidence two warrants of commitment, committing Allen to the prison, and also two warrants of commitment committing Hamlin to the prison, covering and including the time when the homicide was committed. The defendant objected to the two warrants committing Hamlin to prison, claiming that they could not be received to affect Allen. The court were of the opinion that the evidence established a *primâ facie* case of conspiracy between Allen and Hamlin, and admitted the evidence, the counsel for the defendant excepting.

The court charged the jury as follows: "If the jury shall find that Hamlin and Allen, at some time previous to the homicide, made up their minds in concert to break the state

State *v.* Allen.

prison, and escape therefrom at all hazard, and knowing that the enterprise would be a dangerous one, and would expose them to be killed by the armed watchmen of the prison, should they be discovered in making the attempt, willfully, deliberately and premeditatedly determined to arm themselves with deadly weapons, and kill whatever watchman should oppose them in their attempt; and if the jury shall further find that in pursuance of such design they armed themselves with loaded revolvers, to carry their original purpose into execution, and while engaged in efforts to escape from the prison were discovered by the watchman Shipman, the deceased, and in the scuffle which ensued he was willfully killed by Hamlin or Allen while they were acting in concert, and in pursuance of their original purpose so to do in just such an emergency as they now found themselves in, then Hamlin and Allen are both guilty of murder in the first degree. And in the opinion of the court Allen would be guilty of murder in the first degree if, in the state of things just described, he in fact abandoned, just before the fatal shot was fired by Hamlin, all further attempt to escape from the prison, and the infliction of further violence upon the person of Shipman, without informing Hamlin by word or by deed that he had so done; and Hamlin, ignorant of the fact, shortly after fired the fatal shot, in pursuance of and in accordance with the purpose of the parties down to the time of the abandonment.

"In other words, if during the fatal encounter with deadly weapons, in the state of things just described, Allen suddenly abandoned Hamlin, abandoned the enterprise, and went to his cell without saying a word to Hamlin to the effect that he had abandoned the enterprise, and Hamlin, supposing that he was still acting with him, and that he had gone to his cell for some instrument to carry on the encounter, fired the fatal shot, his abandonment under such circumstances would be of no importance. A man cannot abandon another under such circumstances and escape the consequences of the aid he has rendered up to the time of the abandonment. The law regards the aider and abettor in all cases equal with the prin-

State v. Allen.

cipal in guilt, for it considers that without the aiding or abetting the crime would not have been committed. So the law holds all the parties concerned equally guilty. In cases of burglary it often happens that one person goes into the house, and three or four watch out of doors to give alarm to the one in the house if it should become necessary. In such cases each of the parties who renders assistance in watching is equally guilty with the man who goes into the house to commit the crime."

The jury returned a verdict of murder in the first degree. The defendant filed the following motion in arrest of judgment:

The defendant, after verdict, and before judgment rendered thereon, moves in arrest, because he says that heretofore, to wit, on the 27th day of March, 1879, being at the same term of court, he was arraigned and put upon trial before a jury legally impaneled and sworn to try said cause, and that after a full hearing of said cause said jury were not able to agree and were discharged from the further consideration of said cause, and the twelve jurors who had been summoned for the trial of said cause, in addition to the regular panel of eighteen, were dismissed for the term, and thereafter, to wit, on the 10th day of April, 1879, being at the same term of said court, the State's Attorney, in the absence of the defendant and of his counsel, and without the knowledge of either of them, and before the trial of the cause commenced, and before it appeared that it would be necessary to summon talesmen in said cause, applied to said court, a single judge only holding the same, for an order to the sheriff to return fifty judicious electors in said cause, and thereupon the court, without the presence of the defendant or his counsel, and without their knowledge, issued such order, which order, with the sheriff's return thereon, is as follows: [setting out the same.] And the sheriff, in obedience to said order, did return fifty men as stated and named in his return on said order, before the defendant was arraigned for trial, and before it appeared that talesmen would be required, otherwise than from the statement of the State's Attorney to the court, made at the time

State *v.* Allen.

of making the application for said order, that a large number of said panel of eighteen were disqualified by reason of having served upon the former trial at the same term. And thereafter, to wit, on the 14th day of April, 1879, the defendant was arraigned for further trial before the same judges who had presided at the former trial, and, after the regular jury of eighteen had been exhausted and two jurors only accepted, the court ordered the sheriff to supply ten talesmen, and from time to time thereafter ordered the sheriff to supply talesmen as needed, without any direction as to their selection, until the panel was completed, and eight of the talesmen so supplied were selected by the sheriff from the fifty summoned to be in attendance as before set forth, and all talesmen supplied were selected from the said fifty, until they had all been called, and two talesmen were supplied afterwards. And that when, on said 14th day of April, 1879, he ascertained the action of the court, and of the sheriff as aforesaid, he objected to the same, and moved the court to order twelve additional jurymen to be summoned from the regularly appointed jurors of the term, in order to avoid the necessity for talesmen, but the court refused to grant the motion, and ordered the trial to proceed, and the trial did proceed before a jury impaneled as aforesaid, all of which he is ready to verify. Wherefore he prays that said verdict may be set aside and no judgment rendered thereon.

The State's Attorney demurred to this motion, and it was overruled by the court.

The defendant thereupon moved for a new trial for error in the rulings and charge of the court, and also filed a motion in error.

*S. F. Jones* and *C. J. Cole*, in support of the motions.

1. The court had no right to order the sheriff to summon fifty electors to be present in the court room, that talesmen might be selected from them. The 9th section of the act with regard to jurymen (Gen. Statutes, p. 433,) provides that "if any jurors so summoned do not appear, or shall be excused from attending court, the court may, at its discretion,

State *v.* Allen.

from time to time, direct the clerk to issue a warrant or warrants to summon, in manner as aforesaid, additional jurors, so as to prevent, as far as may be consistent with the convenient dispatch of business, the necessity of filling up the panel with talesmen." And the 12th section of the same act provides that "if a sufficient number of the jurors do not appear, or if for any cause there shall not be a sufficient number of jurors to make up the panel, the court may order the sheriff to return such number of judicious electors of the county as may be necessary." The court had therefore no power to issue an order for talesmen until after it had been ascertained, judicially, in the very cause, that there was not a sufficient number of jurors to make up the panel, and this could only be ascertained after they had commenced to impanel the jury and by two judges sitting in the cause according to law. If, prior to the beginning of the trial, the court were of opinion that a sufficient number of jurors would not be in attendance, it could only proceed under the provisions of the 9th section above given, such proceedings being intended, in the words of the statute, "*to prevent the necessity of filling up the panel with talesmen.*" But the court ignored the statute and ordered the sheriff in advance of the trial, and before the necessity appeared, to return *fifty judicious electors*, not fifty jurors drawn according to law. Again, in issuing the order for talesmen, the court exercised a judicial power which could only arise on the trial of the cause, and therefore the prisoner and his counsel were entitled to be present and be heard, and a single judge was not competent to act as the court upon the trial and issue such order. Gen. Statutes, 538, § 4. Sec. 9 of the Declaration of Rights in the constitution of this State provides that, "in all criminal prosecutions the accused shall have a right to be heard by himself and by counsel, * * and in all prosecutions by indictment or information a speedy public trial by an impartial jury." And § 21 provides that "the right of trial by jury shall remain inviolate." The impaneling of the jury in a cause in which the life of the accused is in question, the selection of the tribunal upon which the question of life and death depends, must be as important to

him as any part of the trial, and one in which the constitutional guaranty should remain inviolate. Does the constitution intend that he shall be heard in one part of the case and not in another? If the accused had been heard upon this order what would he have said? Manifestly that it was wrong; that the order should issue from two judges, or at least that two judges should determine whether or not it should issue; and that it should summon, not judicious electors, selected at the caprice of the sheriff, but jurors appointed by the civil authority of the towns, and drawn from the jury boxes, according to law. This was a most important question, the result of which would affect the whole subsequent course of the trial, and yet the party most interested was excluded from the hearing, and the *ex parte* statement of the State's Attorney was accepted as the truth. There was a question of fact as well as a question of law to be passed upon by the court. By our practice the court decides challenges to jurors; it is the exercise of a judicial authority preliminary to the determination of the question whether or not talesmen will be required to fill the panel; when the court arrives at an incorrect conclusion it may be the subject of review. *State v. Potter*, 18 Conn., 171. In the statute quoted above, the legislature recognizes the necessity of summoning talesmen as one which should be avoided if possible. It should be avoided because of its danger to the due administration of justice. The law had provided a body of jurymen selected by the civil authority from the best men of the several towns, and had provided for a selection from that body of men in a manner which should secure an impartial jury. When the law had been so careful as to the body of men and as to the selection from them, was there no danger in entrusting to a single officer the selection of fifty jurors according to his discretion for the trial of a single cause, a number three times greater than is usually summoned for that purpose? It may be said that the statute gives the judges a discretion to summon jurors or not under its provisions. The court may at its discretion issue a warrant to summon additional jurors; so far it has discretion. But the court having determined to

exercise its discretion the statute leaves no discretion as to the jurors to be summoned, nor as to the manner of summoning—it shall be "*to summon additional jurors in manner aforesaid,*" that is, from the duly appointed jurors of the county drawn according to law.

2. Was the tribunal as constituted an impartial and proper one for the trial of the cause? It must be remembered that the judges holding the court and acting as judges had previously tried Hamlin at the same term, and had presided at a previous trial of Allen held immediately after the trial of Hamlin, and about two weeks before the last trial, upon which the jury had stood eight for acquittal and four for murder in the second degree. By reference to the record it will appear that the court considered the fact that certain jurors on the panel had served at the former trial as a disqualification, and therefore issued the order discussed in the preceding part of the brief. If that fact disqualified a juror, why should it not also disqualify the court, which was a part of the tribunal and as subject to impression as the body of jurymen?

3. The evidence in the case tended to show that the pistol called the four-shooter belonged to Hamlin, and had been discharged, that the ball found in Shipman's body fitted that pistol, and that Shipman in his dying declaration had stated that after he was bound Hamlin returned and shot him, and that Hamlin was alone with Shipman when they were discovered by the prison officials. The State claimed that the evidence did not show that the seven-shooter, which had never been discharged, belonged to Allen, while the defense claimed from the evidence that it did not belong to him. For the purpose of showing that Allen knew the precise condition of the seven-shooter, a fact that he could not have known had it not been his pistol, and thus furnishing some evidence to corroborate the other evidence in the case showing that the seven-shooter was Allen's, the counsel for Allen asked Arnold the following question: "Did Allen inform you as to the condition of the pistol (that is, the seven-shooter) before you found it?" The question was objected to by the

State, and ruled out by the court. The evidence was circumstantial, and as such tended to corroborate the other evidence in the case. The purpose of it was to show that the accused had a knowledge as to the condition of the seven-shooter—the fact of his knowledge being material—which he could have acquired only in one way.

4. The warrant of commitment against Hamlin was not admissible, and should have been rejected by the court. The conspiracy which the evidence tended to prove was to escape from the prison by bribing a watchman. The Hamlin warrant could furnish no legitimate evidence against the accused, either of conspiracy, or of the facts charged in the indictment. The purpose of introducing it was to influence the jury adversely, by means of recitals contained in it which were not legitimate evidence. The tendency of it, while not evidence, was prejudicial to Allen.

5. There was error in the charge of the court. The court charged that if during the fatal encounter with deadly weapons, in the state of things described, Allen suddenly abandoned Hamlin, abandoned the enterprise, and went to his cell without saying a word to Hamlin to the effect that he had abandoned the enterprise, and Hamlin, supposing that he was still acting with him, and that he had gone to his cell for some instrument to carry on the encounter, fired the fatal shot, his abandonment under such circumstances would be of no importance. This part of the charge is erroneous in holding that, under the circumstances stated, Allen would be guilty of murder in the first degree if he had in fact abandoned the enterprise and gone to his cell, without informing Hamlin, and Hamlin had thereafter killed Shipman. Suppose the original purpose to have been to escape by bribery, and if not successful in that, to use all necessary force, and in pursuance of that Shipman was gagged and bound. When gagged and bound the presumption would arise that they had used all the force necessary, all that the circumstances called for, and therefore that it would not be found necessary to kill. The gagging and binding were an accomplished fact, no further violence was intended against Shipman, and a time

had arrived when the limit of necessary violence had been ascertained and fixed by the gagging and binding. The prison is then alarmed, and the prisoner Allen, giving up all hope of escape at the time, has left Hamlin and Shipman, has abandoned the further prosecution of the escape, and Hamlin from a sudden impulse, recklessly, and without reason, and beyond the necessity which was originally thought of, shot Shipman in the heart. Would Allen be guilty of murder in the first degree under our statute, and upon such a state of facts? Let it be remembered that the object was to escape, and that by the use of means which would be likely to accomplish that fact. When Allen had abandoned the attempt to escape, had left the presence of Hamlin, and gone to his cell, shall he be held liable for the drunken frenzy of Hamlin, both useless and unnecessary? The fact that Allen gave up the enterprise and went to his cell was enough of itself to absolve him from all further responsibility for the acts of Hamlin. That was in itself a declaration to Hamlin that he had abandoned the enterprise, and it can not affect the case that Hamlin did not so understand it. It was perhaps all that Allen could do in the circumstances. After Allen had abandoned the enterprise the killing of Shipman cannot in any reason be said to be his willful, deliberate and premeditated act, and therefore he could not be held guilty in the first degree, under our statute. *Rex* v. *White*, Russ. & R. C. C., 99. The court further erred and misled the jury in charging that the law regards every aider and abettor in all cases equal with the principal in enormity of guilt, and that the law holds *all the parties concerned* equally guilty. The charge in that respect is contrary to the principle of the case above cited, and opposed to the statute which has divided the crime of murder into degrees for the purpose of distinguishing between the guilt of a principal, and the guilt of others, who though concerned in the enterprise do not actually intend the act committed, but who by the barbarous principles of the old law would have been held equally guilty. *State* v. *Johnson*, 40 Conn., 143.

*W. Hamersley*, State's Attorney, contra.

State *v.* Allen.

BEARDSLEY, J. This case comes before the court by motion in error from the judgment of the court below, and also by motion for a new trial.

The first specific ground of error assigned is, "that the court erred in issuing an order to the sheriff, in the absence of the defendant, and in the absence of his counsel, and without their knowledge, and before the trial commenced, to summon talesmen for the jury to be impaneled for the trial of said cause."

This claim of the defendant is founded upon a mistaken view of the action of the court. The order in question was not an order to summon talesmen to supply the panel in this case, but was issued several days in advance of the trial, to procure the attendance of persons from whom talesmen might be taken if they should be required and the sheriff should so elect, and thus to make some provision against delay in filling the panel. The sheriff when called upon by the court to supply talesmen might take them from the persons so in attendance, or might, if he saw fit, take them from outside persons. His discretion in this particular was limited only by the statute, which requires that they shall be "judicious electors."

It is not unusual in practice for a sheriff, of his own motion, in anticipation of a trial in which there will probably be a deficiency of jurors summoned for the term, to procure the attendance of persons qualified to act as such at the time when the jury is to be impaneled; nor for the court under such circumstances to suggest to the sheriff in advance of the trial that he have such persons in attendance. Some of the inconvenience and delay consequent upon postponing the trial to procure the attendance of jurors may thus be saved, and we know of no reasonable objection to the practice.

Such suggestions or directions when made by the court are usually verbal, but the fact that in the present case the directions to the sheriff were in writing seems to us immaterial.

The information upon which the court acts in such cases may properly be obtained from the public prosecuting officer. The complaint of the counsel for the accused that they were not consulted, seems to us to be without foundation.

State v. Allen.

Another ground of error assigned is, that the court which issued the order was held by one judge only. We have already observed that the proceeding referred to was in no sense a part of the trial, and hence the attendance of two judges was unnecessary.

The further assignment "that it was error to proceed to a new trial at the same term and before the same judges who had presided at the preceding trial, is sufficiently answered by a statement of it.

The only remaining assignment of error is, that the court erred in refusing the motion of the defendant to summon twelve additional jurors from the regularly appointed jurors of the term.

The statutory provision referred to by counsel in support of this claim (Gen. Statutes, p. 433, § 9), in terms refers the summoning of new jurors to the discretion of the court. The refusal of the court to exercise its discretion in the manner requested by the defendant is no ground of error.

The motion for a new trial shows, that upon the trial it was claimed by the State that the accused and one Henry Hamlin, both of whom were lawfully confined in the state prison, conspired to escape from such confinement, and to use all means which might become necessary to effect such escape, even to the taking of the life of any one who might oppose them, should it become necessary to do so in order to overcome such opposition; that in pursuance of such combination they provided themselves with two loaded revolver pistols, one a seven-shooter, and the other a four-shooter, and with handcuffs and a gag, and on the evening of September 1st, 1877, escaped from their cells and secreted themselves in the hall of the prison, where they were discovered by Welles Shipman, an armed night-watchman of the prison, and that thereupon they both fired at Shipman, who was wounded by one of the shots, and died from such wound on the next day; and that after Shipman was wounded he ran towards the alarm bell, pursued by the accused and Hamlin, who overtook him, when he sank insensible upon the corridor, and was then handcuffed and gagged by them; that Allen then went

State v. Allen.

to his cell about one hundred and fifty feet distant, leaving Hamlin with Shipman, where he was discovered and fired at by the guard of the prison, and that thereupon Hamlin went to the cell of Allen and that both then broke into the attic and were taken the next morning. The State claimed that Shipman was shot before he was handcuffed.

It was claimed by the defense that if there was any conspiracy between the accused and Hamlin it was merely to bribe an officer of the prison to permit them to escape, and that whatever was done after Shipman discovered the accused and Hamlin, was not in pursuance of any plan or conspiracy; and that immediately after Shipman was handcuffed and gagged Allen abandoned the enterprise and went to his cell, and that Shipman was afterwards shot by Hamlin alone.

It was admitted upon the trial that the bullet found in Shipman's body fitted the four-shooter and did not fit the seven-shooter, which was of smaller callibre. The defense claimed that the seven-shooter was the pistol carried by Allen and that it had not been discharged, and in support of this claim called as a witness an officer of the prison, who after testifying that he found the two pistols in the attic of the prison, upon information given him by Allen of the place where they were concealed, was inquired of, "Did Allen inform you as to the condition of the pistol before you found it?" This question, upon the objection of the State, was excluded, and we think properly so. The defense claims that the question is not within the operation of the rule that the accused cannot avail himself in evidence of his own declarations, because Allen's knowledge of the condition of the pistol, (assuming that the question related to the seven-shooter,) could not have been acquired unless it was the one which he carried, and that such knowledge is therefore a fact to which he was entitled. There would be some force in this claim if the assumption of the defense as to Allen's means of knowledge was well founded, but it is not. We suppose that by "the condition of the pistol" is meant its condition as to being loaded or otherwise. While Allen and Hamlin were together after Shipman was shot and before

they were taken the next morning, each had every oppor-
tunity to know the condition of the other's weapon, and
would, naturally, have been informed as to it.

The objection of the defense to the two warrants of com-
mitment under which Hamlin was imprisoned was properly
overruled. The evidence was admissible and important, in
connection with proof of the combination of Allen and
Hamlin to escape, to characterize such combination as a con-
spiracy, by showing that they were lawfully imprisoned, and
hence that the combination was for a criminal purpose, and
the existence of the conspiracy being proved, to show that in
its prosecution Hamlin, for whose acts Allen his co-conspir-
ator was liable, was not striving to liberate himself from
illegal imprisonment, but was criminally attempting to escape
from lawful custody.

The court charged the jury as follows: "If the jury shall
find that Hamlin and Allen, at some time previous to the
homicide, made up their minds in concert to break the state
prison and escape therefrom at all hazard, and knowing that
the enterprise would be a dangerous one and expose them to be
killed by the armed night watchman of the prison should they
be discovered in making the attempt, willfully, deliberately
and premeditatedly determined to arm themselves with deadly
weapons, and kill whatever watchman should oppose them in
their attempt; and if the jury should further find that in pur-
suance of such design they armed themselves with loaded
revolvers to carry their original purpose into execution, and
while engaged in efforts to escape from the prison were dis-
covered by the watchman Shipman, the deceased, and in the
scuffle which ensued he was willfully killed by Hamlin or
Allen while they were acting in concert and in pursuance of
their original purpose so to do in just such an emergency as
they now found themselves in, then Hamlin and Allen are
both guilty of murder in the first degree. And in the opinion
of the court, Allen would be guilty of murder in the first
degree, if, in the state of things just described, he in fact
abandoned, just before the fatal shot was fired by Hamlin, all
further attempt to escape from the prison, and the infliction

of further violence upon the person of Shipman, without informing Hamlin by word or deed that he had so done, and Hamlin, ignorant of the fact, shortly after fired the fatal shot in pursuance of and in accordance with the purpose of the parties down to the time of the abandonment."

We do not think that the objection made by the defense to this part of the charge is well founded. Under such circumstances Allen's so-called abandonment would be but an operation of the mind—a secret change of purpose. Doing nothing by word or deed to inform his co-conspirator of such change of purpose, the reasonable inference would be that he did not intend to inform him of it, and thus he would be intentionally encouraging and stimulating him to the commission of the homicide by his supposed co-operation with him. Such intent not to inform Hamlin of his change of purpose would, under the circumstances, be decisive of his guilt.

But the charge proceeds: "In other words, if during the fatal encounter with deadly weapons, in the state of things just described, Allen suddenly abandoned Hamlin, abandoned the enterprise and went to his cell, without saying a word to Hamlin to the effect that he had abandoned the enterprise, and Hamlin, supposing that he was still acting with him and that he had gone to his cell for an instrument to carry on the encounter, fired the fatal shot, his abandonment under such circumstances would be of no importance. A man cannot abandon another under such circumstances and escape the consequences of the aid he has rendered up to the time of the abandonment."

A majority of the court think that the jury may have been misled by this part of the charge, and that therefore, especially in view of the grave issues involved in the case, a new trial should be granted.

If Allen did in fact before the homicide withdraw from the conspiracy, abandon the attempt to escape, and with the knowledge of Hamlin leave and go to his cell, Hamlin's misconstruction of his purpose in leaving did not necessarily make his conduct of no importance.

Until the fatal shot there was the "*locus penitentiæ.*" To

avail himself of it Allen must indeed have informed Hamlin of his change of purpose, but such information might be by words or acts; and if with the intention of notifying Hamlin of his withdrawal from the conspiracy he did acts which should have been effectual for that purpose, but which did not produce upon the mind of Hamlin the effect which he intended and which they naturally should have produced, such acts were proper for the jury to consider in determining the relation of Allen to the crime which was afterwards committed.

Allen's act of leaving and going to his cell, if he did so, had some significance in connection with the question of intention and notice, and was therefore proper for the consideration of the jury. How much weight was to be given to it would depend upon circumstances, such as the situation of the parties and the opportunity for verbal or other notice.

The same observations are perhaps applicable to the charge of the court in answer to the sixth request for instructions. While it is clear that the request as made should not have been complied with, the charge that was given may be open to the implication that some notice of Allen's abandonment of the conspiracy must have been given by him to Hamlin beyond that afforded by his act of leaving.

The answers of the court to the other requests for instructions seem to us, in view of the claims of the counsel and the admitted facts in the case, to be correct and sufficiently explicit.

A new trial is advised.

In this opinion GRANGER, SANFORD, and HOVEY, Js., concurred. LOOMIS, J., dissented.