## Commonwealth v. Dorris, alias Fox, alias Davis.

*Homicide in commission of robbery—Responsibility of prisoner for killing of pursuer by confederate—First degree murder.*

One who, having engaged with others in the commission of a robbery, flees and, after abandoning the stolen property, is apprehended and placed in custody, may be found guilty of murder in the first degree for a homicide committed by his fellows who, continuing their flight, thereafter kill a pursuer in an effort to effect their own escape and avoid arrest.

GORDON, Jr., J., dissents, on the ground that the flight was not a part of the robbery and that, even conceding that it was to be regarded as a part of the robbery, nevertheless, the Commonwealth, by taking the prisoner into custody, removed him from the entire subsequent transaction, and he was not, therefore, responsible for the homicide.

Motion for new trial. O. and T. Phila. Co., May Sess., 1926, No. 258.

Certain bandits attacked an automobile in which, among others, there was riding a bank messenger carrying a bag containing $80,000. They transferred the bag to another automobile in which they intended to flee. Through some defect in the mechanism, they could not start the second car, and it was thereupon abandoned; they then fled on foot. They were pursued by citizens and police officers; one of the citizens captured the defendant; the other bandits

Commonwealth *v.* Dorris, alias Fox, alias Davis.

fled in a milk wagon which they pressed into service. They were pursued by an automobile in which was an officer named Cooper; there was continuous firing from the milk wagon into that automobile, which resulted in Cooper being killed. The defendant was indicted for Cooper's murder upon the theory that the fleeing and the robbery were parts of the same transaction, and, therefore, under the statute, he was guilty of first degree murder as a killing in an attempt to perpetrate robbery. The trial judge let the case go to the jury on that theory and the defendant was convicted of murder in the first degree; hence, this rule.

*C. S. Patterson,* for motion.

*Maurice J. Speiser,* Assistant District Attorney, and *Charles Edwin Fox,* District Attorney, contra.

DAVIS, J., July 2, 1926.—The above cause came on for argument on June 25, 1926, upon motion for a new trial, before Hon. Charles E. Bartlett, Hon. James G. Gordon, Jr., and Hon. Howard A. Davis. The defendant was convicted of murder in the first degree. After argument by counsel and a careful consideration of the testimony, the charge of the court and the law, we are of opinion that the verdict of the jury convicting the defendant of murder of the first degree and recommending the penalty of death, was justified under the law and the evidence.

The motion for a new trial is discharged.

GORDON, JR., J., dissenting, Sept. 18, 1926.—Having recorded my dissent from the dismissal of the motion for a new trial in this case, I feel that the gravity of the offence, the importance to the Commonwealth of the question involved, and the enormity of the consequences of a conviction to the defendant, require me briefly to state my reasons for dissenting from the decision reached by a majority of the court.

The case raises a question of law upon which there is no direct precedent in Pennsylvania and little outside of this jurisdiction. The defendant has been convicted of murder of the first degree, and the controlling facts are thus stated in the charge of the learned trial judge:

"It is not necessary for me to go over in detail the testimony in the case. It is not involved nor exhaustive. It was practically all to the point that on May 4th, 1926, between 9.30 and 10 o'clock in the morning, or thereabouts, a messenger of the Olney Bank was given possession of a bag containing $80,000. This bag was placed in an automobile used by the bank to carry to one of its depositories; that in that automobile were seated Officer Kaelin and Mr. Lee, the driver of the car; that they had gone to the branch bank of the Olney Bank and Trust Company, and while the car was there a number of men, five or six men, opened fire with revolvers and shotguns upon that car, shot into the car, and succeeded in taking from the car a brown bag containing $80,000; that it was transferred by the men who attacked that car to a car which had been driven and used by the men who held up the bank car; that when the robbers failed to start the car in which they had been riding and in which they intended to make their flight, after pushing it in order to start it, they abandoned their own car, they abandoned the money which was in that car; they abandoned those shotguns, some boxes of cartridges, a bag of revolver cartridges, and went into flight. They were pursued by certain citizens who were aroused by the shooting. They were pursued by one McCready, who was in an automobile being driven by Mr. Jayne, and in that pursuit Mr. McCready fired a shot from one of the shot-

guns which had been taken from the car of the robbers and shot at or in the direction of the defendant. The defendant was in view of the witness, who testified to that effect, and that when Mr. McCready shot one of the shells from this gun the defendant staggered apparently as though he had been shot, and stumbled on the grass plot in front of a house. He was pursued by Jayne in the automobile, and Mr. McCready captured the defendant on the grass plot at that point. The defendant at that raised his hand and had a revolver, partly loaded, at least, in his hand. He was then taken into custody by McCready and subsequently turned over to a policeman. Several others of the men who had attacked this car kept on in their flight. Two or three of them took possession of a milk wagon. Curry was one of them. I am not sure whether it was Bentley or Juliano who was another one of them. However, it is immaterial as to their names. They kept on in their flight, and while the automobile driven by Mr. Jayne was pursuing them, Officer Cooper came from his house, got in this automobile, and there was a continuous firing from the milk wagon back into that automobile, and as a result of a gunshot wound fired from that milk wagon, Officer Cooper was killed."

From this summary of the evidence, it will be observed that after the defendant and his accomplices had committed the robbery they fled in an automobile and were immediately pursued. Shortly after the flight began, they abandoned their automobile and the stolen property, and continued the flight for a short distance on foot. At this point, the defendant was apprehended and placed in custody. His accomplices then seized a passing milk wagon, ejected the driver, and their flight and pursuit continued for a distance, which, though not clear, would seem from the evidence to have been more than half a mile, when the deceased officer, who had joined in the pursuit after the defendant had been arrested and placed in custody, was killed by one of the accomplices in resisting the pursuit. This raises the question whether one who, having engaged with others in the commission of a robbery, flees, and, after abandoning the stolen property, is apprehended and placed in custody, is responsible for a homicide committed by his fellows, who, continuing their flight, thereafter kill a pursuer in the effort to effect their own escape and avoid arrest.

This question may be approached from two different points of view, in either of which, it seems to me, the conclusion must be reached that one in the situation of the defendant is not responsible for a homicide so committed. The case was sent to the jury solely upon the theory that the homicide was committed in the perpetration of a robbery, which would make the crime murder of the first degree, and that the defendant, as a *particeps criminis* in the robbery, was equally responsible with his fellows, who actually committed the murder.

The first of the viewpoints referred to calls for a determination of the scope of the offence of robbery; that is, whether flight is a part of the crime, for, if it is not, the homicide was not committed in the perpetration of the robbery, and the defendant would not be responsible for statutory first degree murder; and the second involves the effect of the defendant's withdrawal from participation in the crime by his arrest and detention, and his consequent responsibility for acts subsequently committed by his former fellows in crime.

Upon the first of these questions the authorities are not in accord, and in the few cases in which it has arisen much ingenuity of reasoning has been expended by those courts which have treated it. For example, the Supreme

Court of the State of Ohio has held that flight is part of the offence, and that all are responsible for a homicide committed by an accomplice in flight (Conrad v. The State, 75 Ohio 52), although strong dissenting opinions were filed in that case. The courts of New York, on the other hand, have adopted the opposite view, and have held that flight from the scene is no part of the crime, and that, therefore, one is not responsible for a murder committed by a fellow-criminal during flight, in the absence of proof of a pre-existing agreement to kill in such circumstances.

A careful reading of the various authorities inclines me to the view that the better reasoning supports the theory adopted by the courts of New York. There, a distinction seems to have been drawn between attempted escapes from the actual scene of the crime and flight after an escape has been effected. Thus, in The People v. Giro, 197 N. Y. 152, the killing occurred upon the premises in which a burglary was committed after the crime had been interrupted by discovery, and all were held responsible. (See, also, to the same effect, Holmes v. The State, 6 Okla. Crim. Repr. 541.) Where the escape has been accomplished, however, and the fleeing felon has left the scene of his offence, it was held in The People v. Marwig, 227 N. Y. 382, that an accomplice was not responsible for a killing committed by a fleeing felon. To the same effect is The People v. Huter, 184 N. Y. 237. In the latter case, the trial judge, after charging upon the law respecting wilful, deliberate and premeditated killing, told the jury that: "In case the defendant did not intend to kill Officer Enright, and the killing was without premeditation and deliberation, that if the jurors find that he fired the shot at Enright which proved fatal after he had attempted to or had burglarized the premises of Scheel in the manner described by the witnesses, then their verdict ought to be for murder in the first degree."

The charge in this respect was held to be error, the court saying, inter alia: "The defendant had committed a burglary, and if the death of Enright had been caused by him while engaged in the commission of that crime, it would, undoubtedly, have been murder in the first degree; but, as we have seen, after he was discovered by the watchman he immediately ran from the premises, abandoning all of the property which he had stolen, and attempted to escape arrest. It is true that he was immediately pursued by the watchman and Officer Enright, but we incline to the view that this did not operate to continue the burglary after the defendant had abandoned the property that he undertook to carry away and had escaped from the premises burglarized. In all of the cases to which our attention has been called in which persons have been convicted of murder in the first degree by reason of the killing of a person while the accused was engaged in the commission of a burglary, the killing took place upon the premises. . . .

"In the case of Dolan v. The People, 64 N. Y. 485, 487, Earl, J., in delivering the opinion of the court, says: 'If a burglar break into a dwelling-house burglariously with the intent to steal, the offence is doubtless complete before he leaves the building, but he may be said to be engaged in the commission of the crime until he leaves the building with his plunder; and if, while there engaged in securing his plunder, or in any way or in any of the acts immediately connected with his crime, he kills any one resisting him, he is guilty of murder under the statute.' We consequently conclude that at the time of the killing of Enright he had ceased to be engaged in the commission of a burglary."

In People v. Marwig, supra, the homicide was committed by an accomplice of Marwig after they had left the jewelry store at which a robbery had been

committed or attempted, and when they were but a short distance from the store. The deceased seized Marwig, and in the ensuing struggle both fell to the ground. Thereupon, the accomplice shot and killed the deceased, released Marwig, and both men ran away. The court said: "It is evident that if the criminals had escaped and were a mile away from the place of the crime it could not be said that they were then in the commission of a felony. At what distance from the place of the crime would the felony committed in the store end? The rule cannot depend upon some arbitrary measure of distance. It was said in People v. Huter, 184 N. Y. 237, 241, that of all the cases to which the attention of this court had been called in which persons had been convicted of murder in the first degree by reason of a killing of a person while the accused was engaged in the commission of a burglary, the killing took place upon the premises. . . ." (See, also, the discussion of the cases therein referred to.)

Imagination might conceive of cases, not at all improbable, in which it would be ridiculous to hold one responsible for a homicide committed by an accomplice while in flight from the scene of the joint felony. The speed and mobility of modern methods of transportation render it far from improbable that a continuous flight and pursuit might extend over countless miles, across county lines, and even into foreign jurisdictions, before the homicide is committed. Several men might well engage in the commission of a robbery and one be caught at the very scene of the crime, while the others, fleeing in one automobile and pursued by officers in another, might successfully continue the flight for a hundred miles or more, during which time the accomplice already under arrest might well have been lodged in prison, and eaten a meal, or even been indicted, arraigned, pleaded guilty to the robbery and sentenced before the pursuers overtake his fellows and the homicide be committed. Indeed, it would shock the inherent sense of justice to hold one responsible for murder of the first degree in such circumstances. Between such an extreme case on the one hand, and, on the other, a killing by an accomplice within a step of the door of a burglarized house, or a pace from the victim of a robbery, lies an intermediate, uncertain ground, fixed by an indefinite variety of circumstances, where the dividing line of responsibility must be rationally and fairly drawn. As was well said in People v. Marwig, "the rule cannot depend upon some arbitrary measure of distance." It must be sought in the nature of the transaction, and the relation which the acts the accomplices are committing at the time the homicide occurs bear to the main transaction. It may be conceded that a flight, which involves the carrying away of the fruits of a robbery or a burglary, is so linked up with the successful accomplishment of the primary crime that a homicide committed in such a flight would be a part of the crime itself. I would hold, however, that in a case such as the present, where the flight is mere flight, unaccompanied by any effort to effectuate the purposes of the robbery, where the stolen property has been abandoned, the accused been taken into custody, and where the homicide is committed by former accomplices in an effort to secure their own personal safety, only those who are, at the time, participants in the actual flight, to make which successful the homicide is committed, are responsible for it.

There appears to have been no direct decision of this question in Pennsylvania, and neither of the two cases from this State (Com. v. Morrison, 266 Pa. 223, and Com. v. Lessner, 274 Pa. 108), cited by the Commonwealth at the argument to support the contention that flight is a part of the crime, are authority for this proposition. In the Lessner case, the killing was at the

scene of the crime in the course of the escape, and not of the flight, and it was the defendant on trial who committed the murder. The point that the killing was not in the perpetration of the robbery does not seem to have been raised. The question before the court there was whether an accidental killing in what was conceded to be a robbery was within the statutory definition of murder of the first degree, and it was decided that such a killing came within the definition.

The Morrison case, upon which the Commonwealth especially relied, because of certain language of the court, which will be referred to hereafter, was sent to the jury solely upon the theory of wilful, deliberate and premeditated murder. Morrison, the defendant, had committed or attempted a robbery and fled. He was pursued by citizens and cornered at the entrance to a blind alley, and, in order to escape, he shot and killed one of his pursuers. The trial judge admitted evidence of the robbery and the succeeding flight for the purpose of showing motive and intent and to explain the circumstances surrounding the killing. This evidence the Supreme Court held to have been properly admitted, Mr. Justice Kephart saying, inter alia: "The motive which prompted the defendant to shoot the deceased was his desire to gain his liberty. It was perfectly proper to show why Martin, the deceased, had pursued him to the alley and his evident purpose in the alley; this, no doubt, impressed itself on the mind of the accused to such an extent that he felt it necessary to kill the deceased to gain freedom. The evidence of the prior acts is in explanation of the conduct of Martin, the deceased, and of the defendant, and shows the motive that prompted the commission of the crime. In this view, it was undoubtedly relevant evidence. It was further competent as being one of the probable results of an attempted robbery, so much so that where, as in this case, no intervening act broke the series of events, it may be considered as part of the res gestæ."

I do not understand the court to hold here that the murder was part of the res gestæ of the robbery, but rather that the robbery was a part of the res gestæ of the murder. Indeed, the doctrine of res gestæ is one of evidence merely, and includes many acts and circumstances which bear no direct relation to the nature of the crime committed. They may be contemporaneous with or subsequent to the crime, and may even be the acts of third persons, as, for example, the spontaneous declarations of bystanders. The Morrison case does not seem to me, therefore, to be authority for the proposition that flight is necessarily a part of the crime.

In this connection, it may not be amiss to refer to the early English case of Rex v. White, Russell & Ryan's Crown Cases, page 99, in which it was held: "If several are out for the purpose of committing a felony, and, upon an alarm, run different ways, and one of them maim a pursuer to avoid being taken, the others are not to be considered principals in such act."

I am, therefore, of the opinion that the flight in this case was not a part of the robbery; that it was a succeeding act, consequent upon, but not necessarily connected with, the principal crime; that the connection of the particular defendant, whose case is under consideration, with the whole transaction had terminated, whether voluntarily or involuntarily, and that he cannot be held responsible for the homicide committed by his former accomplices.

Apart from the purely legal question just discussed of whether the flight, under the circumstances of the present case, was, in contemplation of law, a part of the robbery, so as to bring the homicide committed in it within the definition of statutory first degree murder, I would hold that the effect of the

arrest of the prisoner and of his custody by the officers of the law was to take him out of the *factum* of the crime and relieve him from responsibility for the acts of his fellows, committed after his arrest, which were not part of the principal crime plotted and engaged in by him. No cold, technical, judicial construction should be invoked to attribute to one so situated the responsibility of an accomplice.

For the purpose of considering this last phase of the question, it must be conceded that flight is a part of the principal crime, although, for the reasons already stated, I am unable to reach such a conclusion. Conceding this, however, the Commonwealth, by taking the prisoner into custody, removed him from the entire subsequent transaction. It is a well settled principle of criminal law, born of considerations of justice and humanity, that the law leaves open to all offenders, to the last moment, the *locus penitentiæ*. So it has been held that one may withdraw voluntarily from a common criminal enterprise, even after it has been begun, and that such withdrawal, if effectually communicated to his companions, relieves him of all responsibility for their future acts: State v. Allen, 47 Conn. 121; State v. Kinchen, 126 La. 39; Pinkard v. State, 30 Ga. 757; Rucker v. State, 7 Tex.-A 549; Reg v. Blackburn, 6 Cox, C. C. 333; Hale, P. C. 618.

Of course, a voluntary withdrawal, to be effectual, must be communicated to one's fellows, because, unless notified, their acts in ignorance of it are done under the moral encouragement of his supposed support and aid. Of this right or opportunity to withdraw and escape responsibility the defendant was deprived by his arrest. He could neither have aided his fellows, if he would, nor have communicated his withdrawal from the enterprise to them. Indeed, the active interposition of the officers of the law destroyed his freedom of voluntary action, and even may have prevented a repentance and possibly successful timely efforts on his part to dissuade his fellows from further resistance and to secure their peaceable surrender before the tragedy occurred. His arrest bound him hand and foot. The arm of the law reached forth and lifted him out of the transaction. And I can conceive of nothing more harsh and unjust than to hold one responsible to the State for acts not specifically planned which are committed by others after the State has seized and fettered the individual. So far as this defendant was concerned, he was out of the enterprise, technically, actually, finally and irrevocably; and, being so out, I see no reason in law for continuing to attach responsibility to him.

I am not unmindful of the gravity and enormity of the offences which the defendant actually committed. I do not forget that the public welfare demands a full and strict application of retributive justice to all who engage in crimes of such magnitude, daring and danger, as those committed by the defendant before his arrest. As has frequently been stated, however, hard cases make bad law, and it should be remembered that the law draws no distinction between persons; that before the bar of justice the worst of men are to be treated according to its uniform and established rules and practice, and that no departure from these can be deemed harmless because of the gravity of the offences committed, the apparent guilt of the accused or the fact that from his own previous acts he can claim little consideration in public feeling.

Notwithstanding all such considerations, I cannot extend the doctrine of constructive responsibility for the incidental crimes of accomplices to the case of this defendant, when the crime he is charged with was committed in his absence, after his forcible removal by the State from possibility of par-

Commonwealth *v.* Dorris, alias Fox, alias Davis.

ticipation in the offence, and when he was thus deprived of the opportunity to protect himself or to remedy his situation. As the case was sent to the jury solely upon the theory that the defendant was responsible for the acts of his accomplices, committed in the perpetration of a robbery which he planned with them, which theory, for the reasons given, I conceive has no proper application to the prisoner's case, I would grant a new trial, in which he would be held responsible only for those acts which, to carry out the conspiracy of which he was a member, he specifically planned.