KARNES v. STATE.

Opinion delivered May 28, 1923.

1. CRIMINAL LAW—DEFENSE—INSTRUCTION.—If testimony of a substantial nature presents a defense, the defendant is entitled to have an instruction given on that subject, though it contradicts his own testimony.

2. CRIMINAL LAW—ACCESSORY—ABANDONMENT.—One cannot aid and advise another to commit a crime, and, after inducing him to do so by giving advice and encouragement and assurance of support, escape responsibility by saying that the crime was not committed at the time and place or in the manner he had advised; he must not only withdraw the aid and assistance which prompted and induced the commission of the crime, but he must communicate the fact of his withdrawal to the person whom he has inspired to commit the crime, and must do so before its commission.

3.  CRIMINAL LAW—LIABILITY OF ACCESSORY BEFORE THE FACT—ABAN-
DONMENT—INSTRUCTION.—An instruction that an alleged acces-
sory before the fact was not liable if, before the felony was com-
mitted, he abandoned the crime and so notified the principal,
was properly refused where there was no evidence that the ac-
cessory had abandoned the crime except his failure to keep a
subsequent appointment with the principal, and no evidence that
he had notified such principal of his abandonment of the under-
taking.

Appeal from Cross Circuit Court; *G. E. Keck,*
Judge; affirmed.

*W. G. Berry* and *Block & Kirsch,* for appellant.

Appellant was indicted as an accessory before the
fact to the crime of robbery of W. W. Black, and could
not be convicted upon the uncorroborated testimony of
an accomplice. Secs. 2309, 3181, Crawford & Moses' Di-
gest. Dill committed the robbery, appellant being at
the time out of the State, and the evidence shows no cor-
roboration of Dill's statement that appellant partici-
pated in any way in the transaction. 49 Ark. 364; 63
Ark. 310; 120 Ark. 148. Even if it be conceded that the
evidence establishes that appellant conspired with Dill
to rob Black on Friday, October 14, it also shows conclu-
sively that the robbery was not committed at the time
or place agreed on, and that appellant withdrew from
the conspiracy before the crime was perpetrated. The
court erred in refusing to give appellant's requested in-
structions numbered 5, 6 and 7. The jury should have
been allowed to pass upon the question of appellant's
withdrawal from the conspiracy. 43 Ark. 368.

*J. S. Utley,* Attorney General, *John L. Carter* and
*Wm. T. Hammock,* Assistants, for appellee.

There was sufficient evidence corroborating the tes-
timony of the accomplice to convict the appellant with
the commission of the crime. Sec. 3181, C. & M. Digest;
115 Ark. 480; 136 Ark. 162; 131 Ark. 599, 233 S. W. 4.
Cases cited by appellant are not applicable to different
facts of this case. 137 Ark. 250; 148 Ark. 351. The tes-
timony does not show appellant's withdrawal from the

conspiracy before the crime was committed, and instructions requested, five, six and seven, were properly refused. There was strong evidence supporting appellant's alibi, but the evidence was in conflict and the jury found against him.

SMITH, J. Appellant, Karnes, was convicted as accessory before the fact to the crime of robbery committed by one Horace Dill on one W. W. Black on October 15, 1921. Dill had entered a plea of guilty to the crime of robbery, and was serving a sentence in the penitentiary when he was called as a witness against Karnes.

Dill testified that he and Karnes lived in Missouri, and that one Dozier Skelton, a brother-in-law of Karnes, lived on Black's farm. Skelton told Karnes that Black habitually carried on his person from three to four thousand dollars, and these three discussed in the spring of 1920 a plan to rob Black. The discussion was renewed in the fall of that year, and the three met in Wynne to perfect the details of the robbery. They agreed the best time to commit the crime was when Black was hauling cotton. Their first plan miscarried because Black did not haul the cotton to the place where they anticipated he would haul it. They again met, and it was agreed that Skelton should write Karnes when Black had another load to haul. Karnes received a letter from Skelton that Black would haul another load on Wednesday or Thursday, and the parties prepared to commit the crime on one of those days. Black did not haul cotton on either day, so Dill and Karnes went to the street fair at Wynne on Thursday night, where they met two young women and an older woman. Dill and Karnes had become impatient over the lack of opportunity to rob Black, and determined to go home on Friday, but, before doing so, Karnes went to the gin on Friday and came back and reported that Black and Skelton had arrived in Wynne. Dill and Karnes put on their overalls and met Skelton for a final conference, at which the plan to rob Black that day was perfected. Karnes insisted that witness Dill and not himself should

go out on the wagon with Black, because Black would know Karnes, as Karnes had been at Black's home a few days before. Karnes was to remain at Wynne, while Dill and Skelton went in the wagon with Black and they were to rob Black on the way to Black's home; and it was agreed that Karnes would meet Dill at a place on the railroad between Fair Oaks and Tilton, these being stations on the Cotton Belt railroad, and that Dill would indicate the point on the railroad near which he would be in hiding by a small pile of torn paper placed in the center of the railroad track.

After Dill had put on his overalls, Karnes took charge of Dill's street clothes, and the men separated, to meet again after the robbery at the point indicated by the pile of paper. Skelton knew the road Black would travel from Wynne to his home, and was to indicate to Dill when a favorable time had arrived and place had been reached for the robbery, but as they drove along Skelton shook his head in protest from time to time, indicating that the time was not propitious on account of the number of people they were meeting and passing on the road, and they arrived at Black's home without an opportunity having been afforded for Dill to rob Black, but, before getting out of the wagon, Skelton whispered and told Dill to come back the next morning and bring Karnes with him. Dill went to the place appointed for his meeting with Karnes, but failed to find Karnes, so he returned to Fair Oaks and spent the night there, and returned to Black's farm the next day, and robbed him in the following manner. He told Black he thought of buying his farm, and Black proceeded to show it to him. More than one opportunity was afforded, but Dill's nerve failed him, but finally, on a third trip from the house into some woods, they came to a ditch, and here the crime was committed. Dill was walking behind Black, when he struck him over the head with his pistol, rendering Black unconscious. This occurred about eleven o'clock Satur-

day morning. The pistol with which he assaulted Black had been furnished him by Karnes. Dill searched Black's prostrate body and found $1,181 on his person. He hurriedly made his way to the railroad, and, after counting off $51 of the money, he divided the remainder into two rolls and hid each roll in a pile of cross-ties. He hid the pistol with one of the rolls of money, and went to Paragould on the train, where he spent the night. The following day he went to Missouri and to Karnes' home. Karnes asked him if he had gotten the money, but he refused to discuss the matter with Karnes at that time because Karnes was drunk. He returned to Karnes' home that evening and found Karnes somewhat sobered, but sick, and told him that he had robbed Black. A short time afterwards Karnes sent another brother-in-law of his back to Cross County with Dill to look for the money, but they found only one of the rolls of bills. Dill testified that the roll which was found was divided equally between himself and Karnes and Skelton, except that he was allowed to keep $51, in consideration of the fact that he had personally committed the robbery; but that Skelton was arrested for this crime, and upon that fact being reported to him by Karnes, he agreed that Skelton might have the $51 to aid him in his trial, and gave the $51 to Karnes to be used for that purpose.

Dill admitted that he never saw Karnes, after leaving him in Wynne, until he saw him in Missouri, after the robbery, and he admitted that he failed to see Karnes at the place appointed for the meeting after Black was to have been robbed on the way to Black's home in the wagon. Dill testified that Karnes told him in Missouri that his nerve failed him after he reached Fair Oaks, and, instead of waiting between that place and Tilton, as he had agreed to do, for Dill to appear, he went home.

After leaving Karnes at Wynne, Dill did not see him again until he saw him in Missouri; and after separating from Skelton at the wagon at Black's home he did not again see Skelton until the robbery had been committed.

Karnes denied Dill's story in its entirety, and testified that he had never been in Cross County until he was arrested for the robbery of Black and carried there to be tried on that charge, and offered testimony which, if believed, established very clearly his defense that he was in Missouri during the time the State's witnesses located him in Cross County.

The two girls with whom Dill and Karnes went to the fair identified Karnes, as did also the older woman, and three other witnesses, including Black's wife, also identified him as the man they had seen with Skelton a few days before the robbery, and the identification by three of these witnesses was positive and unequivocal. The other three testified they thought Karnes was the man, but they were not certain.

The court gave, at defendant's request, correct instructions on the character and quantity of testimony necessary to corroborate the testimony of an accomplice to support a conviction; but the court refused to give, at defendant's request, instructions numbered 5, 6 and 7. These instructions deal with the same phase of the case, and we set out instruction numbered 7, which is typical of the other two. It reads as follows:

"Even though you may believe and so find, beyond a reasonable doubt, that the defendant was in Cross County, Arkansas, prior to the commission of the crime with the witness Dill, and that he encouraged and advised the said Dill to commit the same, yet if you find that the crime was to be committed on Friday, October 14, 1921, by witness Dill, and that, after the commission of the crime, the defendant was to meet Dill at a place on the railroad between Fair Oaks and Tilton, and that, after such agreement was so made, the said Dill, for any cause, abandoned the commission of said crime on said date, and that the defendant Karnes had likewise abandoned the commission thereof in good faith, and that he had left the State of Arkansas and gone to the State of Missouri, and was in said State on the date of the com-

mission of the crime, and that said Dill had notice that the said Karnes had abandoned the intent to commit the crime, and with such notice the said Dill thereafter, on Saturday, the 15th day of October, committed said crime, then the court instructs you that the defendant is not guilty, and you will return a verdict for him.''

It is earnestly insisted that error was committed in refusing this instruction, it being insisted that, when Karnes failed to meet Dill at the meeting place on the railroad, and then went to Fair Oaks, where he also failed to meet Dill, this was notice to Dill that Karnes had not and would not carry out his part of the agreement, and that, having such notice, Dill could not assume that Karnes was concurring in his conduct on Saturday, when the robbery was carried out in a manner that had never been agreed upon.

Now, the defendant did not testify that he had ever abandoned the conspiracy. On the contrary, his defense is that he never entered it, and all the testimony offered by him was directed to an attempt to sustain that defense.

It is true that, if testimony of a substantial nature presents a defense, the defendant is entitled to have an instruction given on that subject, although it contradicts his own testimony. *Gibson* v. *State,* 135 Ark. 520; *Flake* v. *State,* 156 Ark. 34.

One cannot aid and advise another to commit a crime and, after inducing him to do so by giving advice and encouragement and assurance of support, escape responsibility by saying that the crime was not committed at the time and place or in the exact manner he had advised. He must withdraw the aid and assistance which prompted and induced the commission of the crime, and this withdrawal must not be a mere mental process, of which the actual perpetrator of the crime is unaware, but he must communicate the fact of his withdrawal to the person whom he has inspired to commit the crime, and must do so before its commission.

At section 12 of the article on Accessories in 1 R. C. L., page 139, it is said: "A person who encourages the commission of an unlawful act cannot escape responsibility by quietly withdrawing from the scene. The influence and effect of his encouragement continue until he renounces the common purpose and makes it plain to the others that he has done so, and that he does not intend to participate further. He cannot, by the coward's expedient of running away after he has incited his associates to crime, escape punishment."

At section 27 of the same article, page 147, it is said: "If the accessory withdraws his aid and advice before the crime is committed, and does what he can to prevent its perpetration, he will not be liable if the crime is committed as the result of some new and intervening cause, but mere change of mind will not of itself exonerate him."

In the chapter on Criminal Law in 16 C. J., under the sub-head of Accessories before the Fact, it is said, at section 124, pp. 133, 134: "Where the perpetration of a felony has been entered upon, one who had aided and encouraged its commission may nevertheless, before its completion, withdraw all his aid and encouragement and escape criminal liability for the completed felony; but his withdrawal must be evidenced by acts or words showing to his confederates that he disapproves or opposes the contemplated crime. Thus, his mere flight from the place of the crime before its completion, although his co-conspirators have knowledge thereof, will not relieve him from liability for the consummated crime."

At section 132, page 137, of the same text, it is said: "If one who has counseled or commanded the commission of a crime, or has agreed to take part in it, repents and withdraws, to the knowledge of the other party, before the crime is committed, he will not be liable as an accessory; but if he does not withdraw until it is too late, or fails to let the other party know of his withdrawal, he will be liable."

At section 128, page 135 of the same text, it is said: "But for crimes which are the outcome of a total or substantial departure from his counsel, agreement, directions, or instructions, he is not liable. Where a particular intent is requisite to constitute a crime, an accessory before the fact must have participated in that particular intent."

To the text last quoted there is a note 37-(b) reading as follows: " 'I believe the following criteria will let the most inquisitive reader into the grounds upon which the several cases falling under this head will be found to turn. Did the principal commit the felony he standeth charged with under the influence of the flagitious advice, and was the event, in the ordinary course of things, a probable consequence of that felony? Or did he, following the suggestions of his own wicked heart, wilfully and knowingly commit a felony of another kind or upon a different subject?' Foster, Crown L., p. 372."

Under these tests the instruction was not a correct declaration of the law.

The instruction is abstract. The conspiracy was not to rob Black on the 14th, and on no other day; and while he was hauling cotton, and in no other way. The conspiracy was to rob Black, and the time and place of doing so was a mere detail. Indeed, there had been two plans to rob Black, and both had failed, but the failure in neither case was due, in whole or in part, to the withdrawal of any conspirator from the conspiracy. The failure in the first instance was due to the fact that Black did not haul his cotton to the gin where the conspirators expected him to haul it. The second plan miscarried because there were too many people on the road.

Karnes was not to actually participate in the robbery, according to the second plan. He was not to be present. He was only to wait at an appointed place, and his mere failure to keep the appointment would not support a finding that Karnes had abandoned the crime,

and that Dill had notice thereof, and there was no other testimony in the record upon which to submit that question. The crime was committed with a pistol Karnes had provided for the purpose, and on the morning following the time when its commission had been agreed upon.

Dill testified that Karnes' explanation of his early departure for home was that his "nerve" had failed him, which was, of course, no legal excuse for his prior participation.

We recognize and concede the right of the jury to accept such parts of Dill's testimony as they believed to be true, and to reject the parts believed to be false; but we think there is no reasonable interpretation of the testimony from which the jury could have found that Karnes withdrew from the conspiracy and notified Dill of that fact. He was either guilty from the beginning of the conspiracy until the spoils were divided, or he was never a party to the conspiracy at all; and we think no error was committed in refusing to give the instruction set out above.

We think the testimony was legally sufficient to support that of the accomplice Dill; and it was, of course, a question of fact for the jury to pass upon its truthfulness, as well as the testimony tending to establish an alibi; and, as we find no error in the record, the judgment is affirmed.

### DISSENTING OPINION.

McCULLOCH, C. J. There is testimony from which the jury might have found that the conspiracy was to perpetrate the robbery at a particular time and in a particular circumstance, and that, after the preparations for the crime had proved abortive, so far as that occasion was concerned, appellant abandoned the project in good faith, under such circumstances as was sufficient to give notice to the other conspirators of his withdrawal. If those were the facts, then appellant was not a participant in the subsequent commission of the crime, under different circumstances, so as to make him guilty of aid-

ing and abetting. Of course, this depends on the fact that the aid or encouragement of the crime was limited to a particular time and occasion, for, if such aid and encouragement was given toward the commission of the crime, mere withdrawal from the project did not undo the unlawful participation. Such is, I think, the effect of the authorities cited in the opinion of the majority. Appellant was entitled to an instruction submitting that question to the jury, and the instruction requested by appellant was correct.

HART, J., concurs.