[Crim. No. 1196. Second Appellate District, Division Two.—March 1, 1926.]

## THE PEOPLE, Respondent, v. CAREY WILSON et al., Appellants.

[1] CRIMINAL LAW—ROBBERY—SEPARATE TRIAL—AFFIDAVITS—DISCRETION.—In this prosecution upon an indictment charging two defendants with robbery, the trial court did not abuse its discretion in denying a separate trial demanded by one of the defendants, where the demand was based upon affidavits to the effect that his defense and that of his codefendant would be inconsistent with and contradictory to each other, that his codefendant, after his arrest, had made statements to the officers which tended to implicate both defendants in the robberies, and that if these statements were offered against his codefendant, as the district attorney contemplated doing, the petitioning defendant would be irretrievably injured.

[2] ID.—DEMAND FOR SEVERANCE—HOW DETERMINED.—The determination on appeal of whether there was an abuse of discretion in denying a separate trial must be based upon the showing made when the demand for a severance was presented and not upon what may have occurred afterward.

[3] ID.—TESTIMONY OF ACCOMPLICE—CONSPIRACY.—In such prosecution, the trial court did not err in permitting an accomplice of the defendants to give testimony respecting the plans of the three men to commit other robberies, as proof that the three had entered into a general conspiracy to commit a series of robberies of which the robberies charged were a part.

---

1. See 8 Cal. Jur. 194, and Supplement.

[4] ID.—OTHER CRIMES—EVIDENCE—CONSPIRACY.—While it is the general rule that the evidence must be confined to the issue and that on a trial for felony the prosecution will not be permitted to give evidence tending to prove the defendant guilty of another distinct and independent crime, there are, however, exceptions to this rule. Thus the offense of which a defendant stands accused may have been perpetrated in furtherance of a general conspiracy to commit crime.

[5] ID.—GENERAL CONSPIRACY TO ROB—EVIDENCE.—In such prosecution, since the people had the right to prove the existence of a general conspiracy in furtherance of which the two robberies in question were perpetrated, they had the right to show the whole history of the conspiracy from its commencement to its conclusion; and in such case it is no objection that the evidence covers a great many transactions and extends over a long period of time, or that it may show the commission of other crimes.

[6] ID.—OVERT ACTS—EVIDENCE.—When the question is whether the accused was a party to a general conspiracy, distinct overt acts in furtherance of such a design may be given in evidence.

[7] ID.—GENERAL CONSPIRACY TO ROB—INFERENCE—EVIDENCE.—In such prosecution, the evidence was sufficient to warrant the inference that there existed a general conspiracy to rob—a broad underlying conspiracy in furtherance of which the two robberies charged against the defendants were perpetrated.

[8] ID.—VERDICT ON SECOND COUNT—EVIDENCE.—In such prosecution, the evidence was sufficient to support the verdict convicting one of the defendants of the robbery charged in the second count of the indictment, which verdict said defendant claimed to be unsupported.

[9] ID.—CONNECTION WITH ROBBERY—TESTIMONY OF ACCOMPLICE—SUFFICIENCY OF.—In such prosecution, to warrant a conviction of one of the defendants on the evidence given by the accomplice as to the joint participation of the defendants and of himself in the robbery charged in the second count of the indictment, it was essential that such accomplice's testimony be corroborated by other independent evidence which of itself tended to connect such defendant with the commission of the crime; it is not required that said corroborative evidence be sufficient to establish guilt; but it will suffice if it tended to connect said defendant with the commission of. the crime even though if it stood alone it would be entitled to but little weight.

4. See 8 Cal. Jur. 69; 8 R. C. L. 203.

7. See 8 Cal. Jur. 60.

9. See 8 Cal. Jur. 179; 22 Cal. Jur. 875.

[10] ID.—PHYSICAL PECULIARITIES OF ROBBER—IDENTIFICATION.—The existence of peculiarities about a robber's back and shoulders would constitute a sufficient legal foundation for a victim of the robbery, who did not see the face of the robber, to testify that from his memory of the robber's back and shoulders the accused resembled the robber.

[11] ID.—IDENTIFICATION—EVIDENCE.—It is not necessary that any of the witnesses called to identify the accused should have seen his face; nor is it necessary that the identification be made in positive terms by any of the witnesses; and a conviction may be sustained though the witnesses decline to swear positively, and testify merely that they believe the accused is the person whom they saw commit the crime.

[12] ID.—ALLEGED MISCONDUCT OF DISTRICT ATTORNEY.—In such prosecution, the claim of alleged misconduct on the part of the district attorney in the latter's examination of a witness for the prosecution cannot be sustained where there is nothing in the record to indicate bad faith on the part of the district attorney, or that any of the questions were asked for the wanton purpose of raising a prejudice against either of the defendants, and the alleged misconduct was not assigned as error.

[13] ID.—SEPARATE TRIAL—EVIDENCE.—In such prosecution, one of the defendants was not entitled to a separate trial where he made no showing in the trial court on his own behalf and where the showing made by his codefendant on the latter's motion for a severance was not such as to render the court's refusal to grant a separate trial an abuse of discretion.

[14] ID.—CONVICTION OF FIRST COUNT—ABSENCE FROM SCENE OF ROBBERY—EVIDENCE.—In such prosecution, the evidence was sufficient to support the verdict finding one of the defendants guilty of the robbery charged in the first count of the indictment, notwithstanding his absence from the scene of the robbery.

[15] ID.—CONSPIRACY—WITHDRAWAL—NOTICE.—A person who, by conspiring with others, advises and encourages the commission of an unlawful act cannot escape responsibility by quietly withdrawing from the scene. The influence and effect of his advice and encouragement continue until he renounces the common purpose and makes it plain to the others that he has done so and that he does not intend to participate further, and his withdrawal from the conspiracy must in some way be brought home to the knowledge of his confederates before the commission of the contemplated crime.

10. See 8 R. C. L. 183.
11. See 8 Cal. Jur. 37.
15. See 1 R. C. L. 139.

[16] ID. — EVIDENCE OF CONVERSATION — CHARACTER OF OBJECTION —
TARDY MOTION TO STRIKE OUT.—In such prosecution the trial court
did not err in permitting a witness to testify to a conversation
which he had with one of the defendants some two or three months
after the arrest of the robbers, where such witness proceeded to
give the conversation without objection until the witness, in re-
sponse to a question by the trial judge, fixed the date of the
conversation, whereupon such defendant's counsel interposed an
objection as follows: "I object to that on the ground it is in-
competent, irrelevant, and not within the issues of this case," and
such defendant's counsel, after the witness concluded his direct
examination by giving additional details of the conversation and
after cross-examination respecting certain details of the conversa-
tion, moved for the first time to strike out the conversation.

[17] ID.—MOTION TO STRIKE OUT—TIME.—In such prosecution, the
motion to strike out such conversation should have been made as
soon as the direct examination was closed, and such defendant's
counsel could not take the chance of a cross-examination and
then move to strike out.

---

(1) 16 C. J., p. 786, n. 78; 17 C. J., p. 231, n. 63.    (2) 17 C. J.,
p. 205, n. 29.    (3) 16 C. J., p. 545, n. 86.    (4) 16 C. J., p. 586,
n. 98, p. 591, n. 33, p. 611, n. 39.    (5) 16 C. J., p. 611, n. 46.
(6) 16 C. J., p. 545, n. 86 New.    (7) 34 Cyc., p. 1808, n. 78.    (8) 34
Cyc., p. 1808, n. 78.    (9) 16 C. J., p. 698, n. 88, p. 701, n. 20, 22,
25, p. 711, n. 21, 23, 24.    (10) 16 C. J., p. 712, n. 30, p. 751, n. 86
New.    (11) 16 C. J., p. 549, n. 52, p. 750, n. 83, p. 751, n. 86 New,
p. 774, n. 49, 51.    (12) 17 C. J., p. 71, n. 47, p. 183, n. 59.    (13) 16
C. J., p. 788, n. 22.    (14) 34 Cyc., p. 1808, n. 78.    (15) 16 C. J.,
p. 137, n. 54.    (16) 16 C. J., p. 874, n. 99.    (17) 16 C. J., p. 882,
n. 97.

APPEALS from judgments of the Superior Court of Los
Angeles County and from orders denying new trials.    Arthur
Keetch, Judge.    Affirmed.

The facts are stated in the opinion of the court.

William J. Clark for Appellant Wilson.

Rowen Irwin and Charles A. Barnhart for Appellant Mc-
Cormick.

U. S. Webb, Attorney-General, and John L. Flynn and
H. H. Linney, Deputies Attorney-General, for Respondent.

---

17.  See 8 Cal. Jur. 241.

FINLAYSON, P. J.—By an indictment containing two counts Carey Wilson and Clifford McCormick were jointly charged, in each count, with the crime of robbery, committed in the city of Los Angeles. Count one charges that on March 17, 1924, the defendants robbed Ben Albins and Joe Bassett of forty-five dollars in money, the property of Albins and Bassett and of the Sultan Turkish Baths, a corporation. This incident is referred to by the witnesses as the Turkish Baths robbery. Count two charges that on March 25, 1924, the defendants robbed E. C. Fitts of eighteen dollars in money, the personal property of Fitts and of the Los Angeles Railway Company, a corporation. This event is referred to by the witnesses as the La Brea bus robbery. Albins and Bassett were, respectively, the night clerk and porter at the establishment of the Sultan Turkish Baths. Fitts was the driver of one of the busses of the Los Angeles Railway Company.

Before the commencement of the trial Wilson demanded that he be tried separately. In support of this motion Wilson presented affidavits to the effect that his defense and that of his codefendant would be inconsistent with and contradictory to each other, that his codefendant, after his arrest, had made statements to the officers which tended to implicate both defendants in the robberies, and that if these statements were offered against his codefendant, as the district attorney contemplated doing, he, Wilson, would be irretrievably injured. The request for a separate trial was denied. The defendants were found guilty on both counts and a separate judgment of conviction on each count was rendered against each defendant, each of whom has appealed from the judgments of conviction against him and likewise from an order denying his motion for a new trial.

The most damaging evidence against defendants was given by a confessed accomplice, one Godfrey Cowdry, testifying as a witness for the People. It was the theory of the prosecution that Cowdry, Wilson, and McCormick had entered into a general conspiracy to commit robberies in the city of Los Angeles—a conspiracy which included not only the two crimes charged in the indictment but a number of other robberies. Cowdry, over defendants' objections, was permitted to give testimony with respect to all of the rob-

beries embraced within the purview of the conspiracy to rob. He was permitted to testify to conversations between the trio respecting the other robberies, and also to testify to acts done by them in furtherance of their common design to rob persons generally in and about the city of Los Angeles. The theory of McCormick's defense was that he was a feigned accomplice—that he was a private detective who, though seeming to participate in the conspiracy, was but seeking to secure evidence which would lead to the arrest and conviction of his two supposed confederates.

As grounds for reversal the appellant Wilson urges: (1) That the court abused its discretion in denying him a separate trial; (2) that error was committed in permitting Cowdry to give testimony respecting the plans of the three men to commit other robberies; (3) that the evidence is insufficient to support the verdict convicting him of the robbery charged in the second count; (4) that the district attorney was guilty of prejudicial misconduct. The points presented by McCormick as grounds for reversal are: (1) That he was entitled to a separate trial upon the showing made by his codefendant, and that the court's failure to order a severance was an abuse of discretion amounting to error; (2) that the evidence is insufficient to support the verdict convicting him of the robbery charged in the first count; and (3) that the court erred in permitting a witness for the People, one Edward T. Dalton, to testify to a certain conversation which the witness had with McCormick in the month of June or July following the robberies.

APPEAL OF THE DEFENDANT WILSON.

[1] The court did not abuse its discretion in denying appellant a separate trial. [2] Our determination of whether there was an abuse of discretion must be based upon the showing made when the demand for a severance was presented, and not upon what may have occurred afterwards. (*People* v. *Erno*, 195 Cal. 272 [232 Pac. 710].) The showing made by appellant in the affidavits which he presented with his motion did not differ substanially from that which was made by the defendant in *People* v. *Perry*, 195 Cal. 623 [234 Pac. 890], where the point was disposed of adversely to the contention now made by appellant. See, also,

*People* v. *Remington,* 74 Cal. App. 371 [240 Pac. 526]; and *People* v. *Swoape,* 75 Cal. App. 404 [242 Pac. 1067].

[3] The court did not err in permitting the accomplice Cowdry to give testimony respecting the plans of the three men to commit other robberies. [4] It undoubtedly is the general rule that the evidence must be confined to the issue, and that on a trial for felony the prosecution will not be permitted to give evidence tending to prove the defendant guilty of another distinct and independent crime. There are, however, exceptions to this general rule. Thus the offense of which a defendant stands accused may have been perpetrated in furtherance of a general conspiracy to commit crime. In such cases the character and purpose of the conspiracy may have a tendency to shed light upon the particular offense charged against the accused. As we already have stated, it was the theory of the prosecution that Cowdry and the two appellants, Wilson and McCormick, prior to the commission of either of the robberies for which the latter were tried, had entered into a *general* conspiracy to commit a series of robberies, and that the two offenses for which appellants were put on trial were but a part of this broad, underlying conspiracy to enter upon a career of crime having for its object the commission of a chain of robberies. If such conspiracy existed it was proper to show it. A conspiracy of that character, if it existed, would tend to shed light upon the acts done by appellants in connection with each of the robberies for which they were indicted. Moreover, the defendant McCormick was not present at the scene in the Turkish Baths robbery. To justify his conviction of that crime it was necessary to establish criminal liability under the general rule that where several persons conspire or combine together to commit a crime each is criminally responsible for the acts of his associates or confederates committed in furtherance of the common design.

[5] Since the prosecution had the right to prove the existence of a general conspiracy in furtherance of which the two robberies here in question were perpetrated, it had the right to show the whole history of the conspiracy from its commencement to its conclusion. In such cases it is no objection that the evidence covers a great many transactions and extends over a long period of time, or that it may show the commission of other crimes. [6] When the question is

whether the accused was a party to a general conspiracy, distinct overt acts in furtherance of such a design may be given in evidence. (*People* v. *Collins,* 64 Cal. 293 [30 Pac. 847]; *People* v. *Berry,* 191 Cal. 109, 122 [215 Pac. 74]; *Commonwealth* v. *Scott,* 123 Mass. 222 [25 Am. Rep. 81]; *Hall* v. *State,* 3 Lea (Tenn.), 552. See, also, *Commonwealth* v. *Stuart,* 207 Mass. 563 [93 N. E. 825]; *State* v. *Roberts,* 95 Kan. 280 [147 Pac. 828]; *Jenkins* v. *Commonwealth,* 167 Ky. 544 [3 A. L. R. 1522, 180 S. W. 961]; and *Worden* v. *United States,* 204 Fed. 1 [122 C. C. A. 315].) In *Commonwealth* v. *Scott, supra,* it was held that on the trial of one charged with breaking into and entering a bank with intent to commit a robbery therein, evidence by an accomplice of a general conspiracy previously formed between the defendant, himself, and others to rob banks, in pursuance of which the robbery in question was planned and carried out, as well as evidence of the acts of the conspirators in making preparations to carry out the robbery, is admissible. In that case the court says: "There being evidence sufficient to be laid before the jury to prove the conspiracy, as to which the presiding justice was in the first instance to determine, it was competent for the government to put in evidence any acts of the several conspirators in furtherance of the common purpose of the conspiracy, either before or after the robbery was committed."' In *Hall* v. *State, supra,* the supreme court of Tennessee held that under an indictment for the burning of a house evidence was admissible of the organization of a band of conspirators to rob and burn houses generally, if the particular act was done by them in furtherance of the general design, although this particular house was selected by them after the original agreement was entered into.

[7] We think the evidence was sufficient to warrant the inference that there existed a general conspiracy to rob— a broad, underlying conspiracy in furtherance of which the two robberies charged against these appellants were perpetrated. It seems that Pershing Square, in the city of Los Angeles, was the favorite rendezvous of the trio for the concoction of their plans. Cowdry, who had pleaded guilty to the two robberies in question and who had confessed his part in the alleged conspiracy, gave testimony which, reduced to narrative form, is substantially as follows: I have known

Wilson about two years. I have known McCormick since about six weeks before our arrest on April 3, 1924. I was introduced to him by Wilson in the poolroom next to the Sultan Turkish Baths. At that time we got to discussing holdups. We discussed the holding up of the Sultan Turkish Baths. We decided that Saturday night, March 15th, was the best night to do it. There would be more money there that night. We discussed the ways of going in there. Mc-Cormick was to drive his father's car and wait outside for Wilson and I. We agreed to meet in Pershing Square previous to the holdup. We agreed to get weapons—two guns and a blackjack. On the day following my introduction to McCormick we met again and renewed the discussion of our plans to rob the Sultan Turkish Baths. After our first meeting in the poolroom the three of us met every day. In Pershing Square, the day following our first meeting, we planned to hold up the Eades grocery store. It was Mc-Cormick who suggested robbing that place. Then we went out and looked at the store. It was also agreed that we rob the Elite cafe. Our agreement to rob that place was entered into prior to the robbery of the Sultan Turkish Baths. We also agreed to rob the Buckingham Apartments. That contemplated robbery was discussed by us in front of the Globe Cafeteria on Olive Street. Four or five days later we got in McCormick's car and went to the Buckingham Apartments. Wilson, armed with one of the guns, and McCormick, armed with the blackjack, went into the apartment house. I remained outside. After a while they came back and told me why they had not robbed the landlady. McCormick said "that he damn near let her have it, meaning the blackjack, and taking a little brooch off her." This was before the Sultan Turkish Baths robbery. A few days prior to the holding up of the Sultan Turkish Baths we planned to rob the Provident Loan Company. McCormick suggested it. The three of us were reading in the newspapers where that company had just lost a big sum of money, and McCormick said it would be a cinch to go up and knock them over again—that they wouldn't expect it to happen again so quickly. We talked about it in Pershing Square. The three of us then went to where the loan company had its place of business. I had the two guns and the blackjack wrapped up in a package. Wilson and I stood outside and McCor-

mick went in and looked around. Right after the holding up of the Turkish Baths, and prior to the bus robbery, we planned to rob Division 3 of the Los Angeles Street Railway Company's car-barns in Boyle Heights. McCormick said he had worked for the street-car company, and knew the best places where to stick them up. He said he had stuck up quite a few of them before. So we got in his father's car and went to the car-barns to look them over. Several days prior to the Turkish Baths holdup, and while the three of us were eating at a table in the Globe Cafeteria, either Wilson or McCormick, I have forgotten which one it was, said he would like to rob the jewelry store next door to the cafeteria. McCormick said the way to do it was to cut a window of the place in the night-time or early in the morning and take the pieces of jewelry out. It was agreed that McCormick's part in all of these proposed holdups should be to drive his father's automobile. He wanted to drive the car because he said he could get his father's Nash. Neither Wilson nor I had a car. Three or four days previous to the Turkish Baths holdup we discussed plans to rob the Hellman bank on Tenth Street. We discussed it while on our way to Alhambra, where we were going to rob a man of the name of ''Broker Smith.'' We found that Smith wasn't home, so we turned around and came back. On the way back McCormick broached the subject of robbing the Hellman bank. He said it would be an easy place to stick up. A day or two later the three of us went down to the bank. [This visit to the bank doubtless was made for the purpose of looking over the premises preparatory to the robbery.] On the night when we held up the La Brea bus we went to the end of about ten different car lines. We drove in McCormick's father's car. We started out to hold up something.

In detailing the circumstances attending the robbery of the Turkish Baths, Cowdry testified substantially as follows: When we first discussed plans to rob the Turkish Baths we agreed to do it on a Saturday night. I told Wilson and McCormick I did not care to do it on a Saturday night—that I was known there and that I was afraid I would be recognized. So we agreed to do the job the next night—Sunday night. The three of us agreed to meet in Pershing Square before going to the scene of the proposed robbery. Wilson and I met, as agreed, at 9 o'clock on the Sunday evening

when we were to hold up the Turkish Baths. McCormick did not show up, though Wilson and I waited until it was long past his appointment. Then Wilson and I went to the house where McCormick lived. Wilson went to the door and inquired for him. McCormick was not at home. Someone told Wilson that McCormick was at Solomon's dance-hall. We went to the dance-hall, but did not find him there. Then Wilson and I returned to Pershing Square. There we met a man whom Wilson knew and who was introduced to me as "Slim." We were minus McCormick and the use of his car, so I proposed that Wilson, "Slim," and I get a taxicab, as it would attract less attention if we went to the Turkish Baths in a taxicab. We remained in the park until about midnight. Then we got a taxicab. On arriving at the baths Wilson and I entered and robbed the place, while "Slim" waited for us outside.

From the foregoing *résumé* of Cowdry's testimony it seems clear that the evidence amply justifies the prosecution's theory that there existed a general conspiracy to commit robberies in and about the city of Los Angeles, and not merely a separate and specific conspiracy for each particular "job." It will be recalled that Cowdry testified that on the night when they robbed the driver of the La Brea bus the three men "started out to hold up something." This expression affords a key to the whole situation. It is evident that from the time these three intriguers commenced hatching their nefarious designs they "started out to hold up something"—to rob anyone at any place that offered the glittering prospect of success. This general conspiracy to engage in robberies and the plots to rob the Turkish Baths and the La Brea bus were not separate conspiracies. The latter robberies were merely the outgrowth and culmination of the general conspiracy. They were merely a part of the objects and purposes of that broader conspiracy to rob. The specific plans to rob the Turkish Baths and the La Brea bus, as products of the general conspiracy to rob, could be fully understood only by showing the nature and character of the general conspiracy. Therefore it was proper, as we have said, to show the whole history of this general conspiracy from its commencement to its conclusion, even though such proof might tend to show the commission by appellants of other crimes than those for which they were on trial. The

general rule is thus stated in *People* v. *Morani*, 196 Cal. 154
[236 Pac. 135] : "It is well settled that a defendant in a
criminal cause can be tried for no other offense than that
charged in the indictment or information, and therefore it
is not competent for the prosecution to prove the commis-
sion of independent crimes by the defendant, the evidence
of which has no tendency to prove some material fact in
connection with the particular crime charged. But this rule
does not exclude such evidence when it logically tends to
prove any fact necessary or pertinent to the proof of the
crime for which the defendant is being tried. Such evidence
is not to be rejected because it also tends to prove the com-
mission of other crimes or because it may prejudice the
defendant in the minds of the jurors. Generally speaking,
such evidence is admissible when it tends to establish intent,
guilty knowledge, motive, a common scheme, plan or system,
or when it tends to connect the defendant with the crime
charged, or when the other crimes are part of the *res gestae.*
(8 Cal. Jur., p. 60 et seq.) "

[8] The evidence was sufficient to support the verdict
convicting Wilson of the robbery charged in the second
count. According to the testimony of the accomplice Cow-
dry, he, Wilson and McCormick jointly participated in the
La Brea bus robbery. If Cowdry's testimony be true there
can be no doubt that Wilson was guilty of that robbery.
[9] But to warrant a conviction on the evidence given by
Cowdry it is essential that his testimony, being that of an
accomplice, be corroborated by other independent evidence
which of itself tends to connect Wilson with the commission
of the crime. It is not required that such corroborative evi-
dence be sufficient to establish guilt. It will suffice if it
tends to connect appellant with the commission of the crime
even though if it stood alone it would be entitled to but little
weight. (8 Cal. Jur., p. 179.) [10] This *quantum* of
corroborative evidence was furnished by the driver of the
bus, Edwin C. Fitts. That witness testified that two of the
bandits entered the bus; that after paying their fare they
took seats in the back of the vehicle; that after the bus had
proceeded for some little distance the two men came for-
ward; that one of them took a seat by the side of the witness,
while the other sat down behind; that the one on the seat
forward pointed a gun toward him and told him that it was

a "holdup"; that neither of the highwaymen wore a mask. Though the witness positively identified Cowdry as the robber who pointed the gun at him, he was not sure as to the identity of the other. He did testify, however, that Wilson "resembled" the other man. He testified that the one whom he said resembled Wilson rifled his pockets, and that though he did not see that robber's face he did see his back and shoulders, and that from his memory of his back and shoulders he was able to say that Wilson resembled the robber who took the money from his pockets. There may have been some peculiarities about the robber's back and shoulders which enabled the witness to say that he "resembled" appellant. At any rate, we cannot say that such peculiarities did not exist, for, quite naturally, the printed record before us would not show them, although they may have been observable to the jury. Such peculiarities would constitute a sufficient legal foundation for the witness' testimony that Wilson resembled the other robber.

[11] It is not necessary that any of the witnesses called to identify the accused should have seen his face. "Identification," says the court in *State* v. *Mason*, 152 Minn. 306 [189 N. W. 452], "may be sufficient though the person making it cannot remember the face. Identification based upon other peculiarities may be reasonably sure." There the Minnesota supreme court held that the identification may be sufficient though the witnesses say that they could not identify the accused from his face, the crime having been committed in the dark, but that they can identify him from his size, his general appearance, his talk, and his walk. In *Bowlin* v. *Commonwealth*, 195 Ky. 600 [242 S. W. 604], the identification, held to be sufficient, was made from a recognition of the defendant's voice. Nor is it necessary that the identification be made in positive terms by any of the witnesses. A conviction may be sustained though the witnesses decline to swear positively, and testify merely that they believe the accused is the person whom they saw commit the crime. Thus in *Commonwealth* v. *Cunningham*, 104 Mass. 545, the witnesses would not swear that the prisoner was the man they saw on the stolen wagon, but that "he resembled him." There the court said: "Upon this question of identity, the evidence offered was all of it competent and proper

for the consideration of the jury. It is impossible to say
that it had no tendency to convict the defendant. Its suffi-
ciency was to be estimated and weighed exclusively by them.''
To the same effect are *People* v. *Rolfe,* 61 Cal. 541; *People* v.
*Franklin,* 46 Cal. App. 1 [188 Pac. 607]; *People* v. *Franke,*
159 Mo. 535 [60 S. W. 1053].

[12] The final point urged by this appellant is miscon-
duct on the part of the district attorney, claimed to have
been committed in the latter's examination of Eugene Case,
a witness for the prosecution. At a previous trial of the
accused, which, it seems, resulted in a disagreement of the
jury, Case testified as a witness for Wilson, who sought to
prove an alibi. Upon that trial Case testified that on the
night of the Turkish Baths robbery he and Wilson, who were
roommates, and a third man spent the evening in the for-
mer's room. Upon the conclusion of the first trial the
district attorney accused Case of having perjured himself,
and caused him to be arrested and put in jail. No formal
charge of perjury was lodged against him. Case remained
in jail for about three weeks, when he suddenly remembered
that he had made a ''mistake'' when testifying that Wilson
was in their room on the night in question. He claimed
that his memory had been so refreshed by a certain incident
that he realized that it was upon another night when the
three men foregathered in the room occupied by himself and
Wilson. On the second trial, the district attorney, for the
purpose, as he claimed, of establishing Wilson's consciousness
of guilt, called Case to the stand and questioned him as to
the occurrences already mentioned, i. e., his arrest, imprison-
ment, change of heart, etc., and also educed from the witness
testimony to the effect that upon several occasions when Case
visited Wilson in jail prior to the first trial appellant asked
the witness if he did not remember that on the night of the
Turkish Baths holdup they and the third man were in the
room occupied by appellant and the witness. Counsel for
McCormick interposed a number of objections to this line of
examination, though it was not aimed at, nor did it affect,
their client. In the course of his argument, addressed to the
court in opposition to the objections interposed on behalf
of McCormick, the district attorney stated that he expected
to show that the testimony given by Case at the previous
trial with respect to the alibi was suggested by Wilson, and

that the evidence was admissible to show a consciousness of guilt on the part of Wilson. Appellant made no objection to any of the questions put to the witness, save that once or twice during the examination, and also during the argument on the objections raised by McCormick's counsel, he interposed with a remark to the effect that the witness' testimony should be confined to what he, Wilson, said and did, and that Case should not be permitted to testify to what occurred to himself, i. e., his arrest, incarceration, and sudden realization while in jail of the mistake which he claimed to have made respecting the date when the three men were together in the witness' room. The misconduct of which appellant chiefly complains is the fact that the prosecutor propounded to the witness the questions whereby it was sought to show that he had been arrested and placed in jail until he remembered that the meeting in the witness' room was not on the night in question. Wilson made no motion in the court below to strike out any of the objectionable testimony.

There is nothing in the record to indicate bad faith on the part of the district attorney, or that any of the questions were asked for the wanton purpose of raising a prejudice against either of the defendants. It frequently happens that in the heat of trial counsel ask improper questions, but inadvertences of that character are not alone sufficient to raise a presumption that the prosecuting officer was wilfully endeavoring to prejudice the accused in the eyes of the jury. Moreover, appellant did not assign the alleged misconduct of the district attorney as error. In no way did he invoke any action on the part of the trial court to obviate the effect of any of the questions now assigned by him as misconduct, although any improper effect of the prosecutor's examination of the witness could readily have been avoided had the court's attention been specifically directed to it. As a consequence of appellant's neglect in this regard he is not now in a position to raise the question of misconduct. (*People* v. *Wong Toy*, 189 Cal. 587, 595 [209 Pac. 543].)

The foregoing covers all of the points urged by the appellant Wilson. We find no merit in any of them. The record shows that he was fairly tried and that he was lawfully convicted of his crimes.

## APPEAL OF THE DEFENDANT M'CORMICK.

[13]   McCormick was not entitled to a separate trial. He made no showing in the court below on his own behalf. He claims, however, that he was entitled to a severance on the showing made by his codefendant. Even if he could thus secure vicarious salvation from the effect of his own sin of omission, still the fact remains that the showing made by his codefendant was not such as to render the court's refusal to grant a separate trial an abuse of discretion.

[14]   Coming now to appellant's claim that the evidence is insufficient to support the verdict finding him guilty of the Turkish Baths robbery: It is not claimed that the testimony of the accomplice Cowdry was not sufficiently corroborated. Indeed, the record discloses that appellant made several extrajudicial statements wherein he admitted co-operation with Cowdry and Wilson in their general conspiracy to rob. True, it was claimed by appellant, when making these statements, that he was only a feigned accomplice and that his real motive was to secure evidence which would lead to the arrest and conviction of his two confederates. But the jury was not obliged to accept as true this self-serving and exculpatory part of his statements. What appellant does claim is that the evidence is insufficient to support the verdict convicting him of the Turkish Baths robbery for the reason that it shows that prior to the commission of that crime he had abandoned the conspiracy to rob that particular place. It will be recalled that on the night when this robbery was committed Cowdry and Wilson met in Pershing Square pursuant to prearrangement, but that McCormick failed to put in an appearance; that after waiting at that rendezvous for some time, with the expectation that McCormick would appear ready to carry out his part of the program, Cowdry and Wilson went to the house where McCormick then lived, and failing to find him there, looked for him at Solomon's dancehall; that still failing to locate their partner in crime, they met with one who was known to Wilson as "Slim," whom they took into the enterprise which was then on foot. By reason of these facts appellant says that this particular "holdup" was "staged in his absence."

As we have seen, there was evidence to warrant the jury in finding that appellant and his two companions, Wilson

and Cowdry, were parties to a general conspiracy to rob. If the robbery of the Turkish Baths was committed by Wilson and Cowdry in furtherance of that conspiracy, and while appellant was still a party thereto, then it may properly be said that appellant counseled, advised, and encouraged it. In that case the mere absence of appellant from the scene of the robbery would not make him any the less liable as a principal, subject to indictment, trial, and conviction as such. In this state the distinction between an accessory before the fact and a principal, and between principals in the first and second degree in cases of felony, has been abrogated (Pen. Code, sec. 971); and it is provided that all persons concerned in the commission of a crime whether they directly commit the act constituting the offense or aid and abet its commission, "or, not being present, have advised and encouraged its commission," are principals in any crime so committed. (Pen. Code, sec. 31.)

It is true that the plan adopted by the conspirators contemplated the presence of appellant at the scene of the robbery, actively aiding and abetting in its commission. But though for some reason he failed to put in an appearance at the appointed hour and place, it is apparent that just such a robbery as was committed at the Turkish Baths by his two confederates was contemplated and arranged for by the conspiracy. The robbery as actually carried out was as much accomplished within the scope of the general plan as it would have been had appellant been present performing his agreed part. The conspiracy was one to commit robbery at the Turkish Baths and at other places. The time and place for committing each of the contemplated robberies were but mere matters of detail. As was said in *Spies* v. *People*, 122 Ill. 1 [3 Am. St. Rep. 385, 12 N. E. 942]: "A plan for the perpetration of a crime or for the accomplishment of any action, whether worthy or unworthy, cannot always be executed in exact accordance with the original conception. It must suffer some change or modification in order to meet emergencies and unforeseen contingencies."

The mere fact that appellant failed to keep his appointment with his confederates and did not perform the precise part for which he had been cast does not necessarily evidence a withdrawal by him from the conspiracy, or detract from the force and effect of the counsel, advice, and encourage-

ment previously given by him. [15] A person who, by conspiring with others, advises and encourages the commission of an unlawful act cannot escape responsibility by quietly withdrawing from the scene. The influence and effect of his advice and encouragement continue until he renounces the common purpose and makes it plain to the others that he had done so and that he does not intend to participate further. (1 R. C. L., p. 139.) His withdrawal from the conspiracy must in some way be brought home to the knowledge of his confederates before the commission of the contemplated crime. (*Karnes* v. *State,* 159 Ark. 240 [252 S. W. 1]; *State* v. *Allen,* 47 Conn. 121; *State* v. *Kinchen,* 126 La. 39 [52 South. 185]; 16 C. J. 137.) In *Karnes* v. *State, supra*—a case having some striking points of resemblance to the instant case—the court says: "One cannot aid and advise another to commit a crime, and, after inducing him to do so by giving advice and encouragement and assurance of support, escape responsibility by saying that the crime was not committed at the time and place or in the exact manner he had advised. He must withdraw the aid and assistance which prompted and induced the commission of the crime; and this withdrawal must not be a mere mental process, of which the actual perpetrator of the crime is unaware, but he must communicate the fact of his withdrawal to the person whom he has inspired to commit the crime, and must do so before its commission." It is true that such knowledge of a conspirator's withdrawal from the conspiracy may be brought home to his confederates by acts as well as by words (*State* v. *Allen, supra*); but it was for the jury to determine whether appellant's failure to appear at the trysting place in order to proceed thence to the scene of the contemplated robbery was or was not sufficient notice to his co-conspirators that he had abandoned the criminal enterprise. The circumstances of the case are sufficient to warrant the finding that appellant's failure to keep his appointment with Wilson and Cowdry on the night of the Turkish Baths robbery was not intended by him to be, and was not understood by Wilson or Cowdry to be, indicative of a withdrawal from the enterprise. Indeed, the circumstances shown by this record, one of which is appellant's subsequent participation in the La Brea bus robbery, warrant

the inference that McCormick had no thought of withdrawing from the general conspiracy to rob.

[16]   The final point made by this appellant is that the court erred in permitting the witness Dalton to testify to a conversation which he had with appellant some two or three months after the arrest of the three conspirators.   Dalton, who is the manager of the protective division of the Pacific Southwest Trust & Savings Bank in the city of Los Angeles, testified that about five months prior to the day when he gave his testimony—his testimony was given on October 31, 1924—McCormick called at the bank and had a conversation with him.   Dalton was asked by the district attorney to give the conversation.   No objection was made to this question, and the witness proceeded to narrate the conversation which he said he had with McCormick.   Before concluding his answer the trial judge interposed with a question asking the witness if he could fix the month when the conversation occurred.   Dalton replied that it occurred in either the month of June or July.   It was after the witness had given this reply to the court's question that McCormick's counsel interposed an objection as follows: "I object to that on the ground it is incompetent, irrelevant and not within the issues of this case."   This objection, the first and only one made during the witness' direct examination, was overruled.   It will be noticed that the objection was not to the question which had previously been propounded to the witness.   Indeed, that question—asking the witness to fix the date of the conversation—was not in itself objectionable.   Nor was the objection tantamount to a motion to strike out any answer previously given by the witness.   The objection, couched in the language in which it was framed and made at the stage at which it was interposed, did not warrant a ruling in favor of appellant.   It was an abortive objection, and the court committed no error in overruling it.   The witness, without further objection from counsel, concluded his direct examination by giving additional details of the conversation which he said he had with appellant.   In legal effect the situation is precisely what it would have been had appellant's counsel made no attempt to interpose an objection during the direct examination of the witness.   At the conclusion of the witness' examination in chief counsel for appellant, without moving to strike out any of the wit-

ness' testimony, cross-examined him respecting certain details of the conversation to which he had testified on his direct·examination. When he had finished his cross-examination of the witness appellant's counsel presented the first and only motion to strike. The motion was to strike out all of the witness' "statement" upon the grounds that it was "incompetent and irrelevant, has no relation to the matter involved in the indictment, is foreign to anything under investigation, and was made at a time subsequent to the date on which the matters charged against defendant took place." The motion was denied.

Irrespective of whether the conversation testified to by Dalton did or did not contain inadmissible statements made by appellant, we think the motion to strike came too late. [17] It should have been made as soon as the direct examination was closed. Appellant's counsel could not take the chance of a cross-examination and then move to strike out. (*Brooks* v. *Crosby,* 22 Cal. 42; *King* v. *Haney,* 46 Cal. 560 [13 Am. Rep. 217].) "The practice, whether in civil or criminal cases, of deliberately permitting evidence to be given without objection in the first instance, and then moving to strike it out on grounds which might readily have been availed of to exclude it when offered, is not to be tolerated." (*People* v. *Long,* 43 Cal. 446.)

. This appellant seems to have been accorded a fair and impartial trial, free from error, prejudicial or otherwise, and was properly convicted.

The judgments against each appellant and the order denying to each of them a new trial are affirmed.

Works, J., and Craig, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 29, 1926.